CARRIE DAVIDSON v. ST. LOUIS TRANSIT COMPANY, Appellant.

In Banc, April 2, 1908.

1. **DAMAGES: Earnings In Future: No Evidence.**   Where there is no evidence of what plaintiff's earning capacity was either prior to the accident or subsequently, it is error to instruct the jury that they should "assess her damages at such sum as they believe, from the evidence, will be a fair compensation . . . for such probable impairment of earning capacity in the future."

2. ———: ———: ———: **Allegations In Petition.**   And in considering the propriety of such an instruction, an allegation in the petition that plaintiff's earning capacity prior to her injury was fifty dollars per month and would have continued to be that in the future had it not been for said injuries, should not be overlooked, for there being no evidence on the subject, the instruction was an invitation to the jury to consider that allegation as fixing the value of her earning capacity.

3. ———: ———: ———: **Age and Condition of Health.** Proof that plaintiff was about thirty years of age and that prior to her injuries she had been strong and in good health, and proof tending to prove that she has since been an invalid and may possibly continue to be, is not a sufficient basis for an instruction as to what her earning power was. There must be some proof of the pecuniary value of the time lost. An estimate of her future earning capacity cannot be based wholly on conjecture. Especially should that be the rule if it is susceptible of reasonably accurate proof.

4. **INSTRUCTION: Assumption of Fact.** It is not error for the instructions to assume the existence of a fact which is not controverted by any testimony and which the parties, by their manner of examining the witnesses and otherwise, throughout the trial assume to exist. So that in this case the court did not err in assuming in its instructions that defendant was a carrier of passengers and that there was a collision between the car on which plaintiff was a passenger and another car, although these facts were charged in the petition and the answer was a general denial.

5. ———: **Broader Than Petition.** Where specific acts of negligence are alleged the instructions should limit plaintiff's right to recover to the specific negligence charged. Where the petition charges that defendant's negligence consisted in permitting the car upon which plaintiff was a passenger to collide with another car on the same track, an instruction permitting her to recover for "any failure on the part of defendant to exercise a very high degree of care and diligence of a very pudent person," etc., is somewhat broader than the allegation.

6. **EXCESSIVE VERDICT: $12,000.** The evidence does not sufficiently show that plaintiff's injuries are permanent, and in view of that fact, and the dramatic incidents of the trial, a verdict for $12,000 is *held* excessive.

Appeal from St. Louis City Circuit Court.—*Hon. O'Neill Ryan*, Judge.

REVERSED AND REMANDED.

*Edward T. Miller* and *T. E. Francis* for appellant; *Boyle & Priest* and *Morton Jourdan* of counsel.

(1) Instruction 1, given at the request of plaintiff, is erroneous because it authorized the jury to return a verdict for plaintiff, if they found that there was any negligence on the part of defendant, instead of limiting them to the particular act of negligence counted on in the petition. Wolfe v. Supreme Lodge, 160 Mo. 675; Abbott v. Railroad, 83 Mo. 278; Price v. Railroad, 72 Mo. 419. (2) Instruction 2, defining the measure of damages, given at plaintiff's request, is erroneous for the reason that it authorized the jury to assess damages "for the probable impairment of plaintiff's earning capacity in the future" when no evidence was given as to what her earning capacity was prior to her injury. 6 Thompson on Negligence, sec. 7307; Voorhies on Measure of Damages (Personal Injuries), sec. 54; Winter v. Railroad, 74 Iowa 448; Railroad v. Bigham, 30 S. W. 254; Railroad v. Simcock, 81 Tex. 503; Railroad v. Artusey, 31 S. W. 319; McHugh v. Schlosser, 159 Pa. St. 486; McKenna v. Gas Co., 198 Pa. St. 31; Britton v. Railroad, 90 Mich. 159; Mfg. Co. v. Woodson, 98 Ala. 378; Railroad v. Pearson, 12 So. 476; Leeds v. Gas Light Co., 90 N. Y. 26; Staal v. Railroad, 107 N. Y. 625; Duke v. Railroad, 99 Mo. 347; Slaughter v. Railroad, 116 Mo. 275; O'Brien v. Loomis, 43 Mo. App. 29; Mammerberg v. Railroad, 62 Mo. App. 568; Stoetzle v. Sweringen, 96 Mo. App. 592. (3) Said instruction 2 is erroneous for the further reason that it authorized the jury to assess damages "for the probable impairment of plaintiff's earning capacity," without limiting their finding to the amount of damages claimed for such impairment in the petition. Carter v. Shotwell, 42 Mo. App. 665; Maupin v. Triplett, 5 Mo. 422; Moore v. Dixon, 50 Mo. 424; 5 Ency. Pleading and Practice, 711; Impkamp v. Railroad, 108

Mo. App. 664; Smoot v. Kansas City, 92 S. W. 363.
(4) The verdict is grossly excessive.

*Seneca N. & S. C. Taylor* for respondent.

(1) A carrier of passengers is required, so far as
it is capable by human care and foresight, to carry
them safely, and it is responsible for all injuries result-
ing to its passengers from even the slightest negli-
gence. Hite v. Railroad, 130 Mo. 139; Clark v. Rail-
road, 127 Mo. 208; O'Connell v. Railroad, 106 Mo. 482;
Furnish v. Railroad, 102 Mo. 450; Leslie v. Railroad,
88 Mo. 55; Waller v. Railroad, 83 Mo. 615; Parker v.
Railroad, 69 Mo. App. 54; Lemon v. Chanslor, 68 Mo.
356; Higgins v. Railroad, 36 Mo. 418; Aston v. Rail-
road, 105 Mo. App. 226; Chouquette v. Railroad, 80
Mo. App. 520; Powers v. Railroad, 60 Mo. App. 483;
Nagel v. Railroad, 88 Cal. 86; Railroad v. Cook, 145
Ill. 551; Lambeth v. Railroad, 66 N. C. 494; Railroad
v. Thompson, 76 Ga. 770; Palmer v. Canal Co., 120 N.
Y. 175; Penn Co. v. Roy, 102 U. S. 451; Railroad v.
Horst, 93 U. S. 291; Railroad v. Derby, 14 How. (U.
S.) 486; 2 Greenleaf on Evidence, sec. 221; 2 Kent's
Com., 600. (2) The collision of cars of a carrier of
passengers for hire, whereby an injury happens to a
passenger, constitutes a prima-facie presumption of
negligence on the part of the carrier, which casts upon
it the burden of showing to the reasonable satisfaction
of the jury that such collision took place notwithstand-
ing the carrier had exercised to prevent the same the
utmost care, skill and foresight of a very cautious per-
son engaged in the like employment, and notwithstand-
ing that the carrier had not been guilty of even the
slightest negligence tending to produce such collision,
but that it was the result of mere casualty or unavoid-
able accident. Unless this presumption is rebutted by
the carrier to the reasonable satisfaction of the jury,
they may regard it as conclusive, but the carrier can

rebut it by showing that the collision which produced the injury to the passenger could not have been prevented by the carrier, or its agents or servants, by the exercise of the utmost care, skill and foresight of a very cautious person engaged in the same business. Reynolds v. Railroad, 189 Mo. 419; Allen v. Railroad, 183 Mo. 436; Magrane v. Railroad, 183 Mo. 119; Och v. Railroad, 130 Mo. 51; Clark v. Railroad, 127 Mo. 197; Furnish v. Railroad, 102 Mo. 453; Hipsley v. Railroad, 88 Mo. 352; Dougherty v. Railroad, 81 Mo. 325; Lemon v. Chanslor, 68 Mo. 356; Higgins v. Railroad, 36 Mo. 432; Aston v. Railroad, 105 Mo. App. 226; Chouquette v. Railroad, 80 Mo. App. 520; Madden v. Railroad, 50 Mo. App. 675; Yerkes v. Packet Co., 7 Mo. App. 267. The above is the Missouri rule, and it obtains everywhere. 1 Kinkead on Torts, sec. 344; Clark's Accident Law, sec. 53, p. 119; 2 Shearman & Redfield on Neg. (5 Ed.), sec. 516; Booth on Street Railroads (1 Ed.), sec. 361; 3 Thompson on Neg., sec. 2754. (3) Plaintiff's instruction 2 is not erroneous, as plaintiff had been a married woman for three years before and at the time she was injured, and at the time of the trial her husband was dead, she a single woman and a physical wreck, made such by the negligence of the defendant. We submit that the cases cited by appellant have not the remotest bearing on the case at bar. They relate to cases of adults where evidence of loss of time and earnings was susceptible of proof, but such loss was not alleged nor proven at the trial. The settled rule as to the measure of damages recoverable for personal injuries caused by negligence of defendant, resulting in personal injuries to a married woman or a minor, is, that without evidence of earning capacity, the jury in assessing damages may take into account the probable impairment of plaintiff's earning capacity in the future, beginning from the time plaintiff will be entitled to his or her

earnings. This rule is based upon the necessities of the case, as will appear from overwhelming authorities in this and other courts, State and Federal. Wise v. Railroad, 95 S. W. 902; Perrigo v. St. Louis, 185 Mo. 290, case of married woman; Tandy v. Railroad, 178 Mo. 247; Chitty v. Railroad, 166 Mo. 436; Schmitz v. Railroad, 119 Mo. 277, action by minor; Rosenkranz v. Railroad, 108 Mo. 17; Furnish v. Railroad, 102 Mo. 669; Grogan v. Foundry Co., 87 Mo. 326; Nagel v. Railroad, 75 Mo. 653; Brunke v. Telephone Co., 112 Mo. App. 623; Mabrey v. Gravel Road Co., 92 Mo. App. 603; Cullar v. Railroad, 84 Mo. App. 345; Dunn v. Electric Co., 81 Mo. App. 45; Blackwell v. Hills, 76 Mo. App. 54; Bartley v. Trorlicht, 49 Mo. App. 214; Railroad v. Humble, 181 U. S. 67; Delaware, etc., Co. v. Devore, 114 Fed. 160; Steam Navigation Co. v. Hollander, 59 Fed. 419; Railroad v. Jones, 49 Fed. 345; McGarahan v. Railroad, 171 Mass. 211; Harmon v. Railroad, 165 Mass. 100; Jordan v. Railroad, 138 Mass. 426; Railroad v. Lacy, 86 Tex. 247; Brunswig v. White, 70 Tex. 511; Railroad v. Edwards, 91 S. W. 641, strong case; Railroad v. St. Clair, 51 S. W. 667; Railroad v. Johnson, 37 S. W. 771; Railroad v. Mayday, 188 Ill. 308; Railroad v. Hastings, 136 Ill. 254; Fisher v. Jansen, 128 Ill. 552; Joliet v. Conway, 119 Ill. 489; Railroad v. Kremple, 103 Ill. App. 1; Railroad v. Warner, 18 Am. & Eng. R. R. Cases 103; Strattner v. Elec. Co., 50 Atl. 57; Houghkirk v. Canal Co., 92 N. Y. 219; O'Meara v. Railroad, 38 N. Y. 445; Feinstein v. Jacobs, 37 N. Y. Supp. 346; Railroad v. Johnson, 91 Ga. 466; Railroad v. Newton, 85 Ga. 517; Powell v. Railroad, 77 Ga. 200; Wimber v. Railroad, 114 Iowa 556; Stutz v. Railroad, 73 Wis. 156; Malone v. Railroad, 152 Pa. St. 391; Jones v. Railroad, 128 Pa. 308; Tramway Co. v. Riley, 59 Pac. 476; Railroad v. Bolt, 59 S. W. 27; Railroad v. Dick, 78 S. W. 914; Beaudin v. Bay City, 99 N. W. 287. At the trial, counsel

for plaintiff showed that after her marriage she did all the housework, washing, scrubbing, sweeping, everything in household duties. The plaintiff was then asked: "Now, I will get you to state, immediately before you were married, say in 1898, 1899, what you were able to do, that is, do as a single woman?" A. "I was employed at the time as general manager of cafes; took full charge; had as high as fourteen and sixteen girls working under me." Mr. Jourdan: "I move to strike out that answer for the reason, first, it is not responsive to the question; and second, that it does not tend to prove any fact in the case, as wholly incompetent and immaterial, and third, that her earning capacity since the death of her husband last year cannot be shown in that way — her earning capacity or ability to work in 1898 or 1899." The Court: "I think that objection is well taken for another reason: we have to deal only with the present and future; the jury cannot consider anything respecting her power of earning except since her husband's death." The answer was stricken out at the instance of counsel for defendant. Therefore, whether the ruling of the court was correct or incorrect, the defendant cannot complain. The doctrine is well settled in Missouri that parties litigant will be confined to the course they have taken throughout the trial, even though that course may be inconsistent with the one in the pleadings. No evidence was necessary other than showing her age and physical condition immediately before her injuries, and this was abundantly shown by the evidence. By the action of counsel for defendant, in its motion to strike out, plaintiff was precluded from showing what pay she received as seamstress or general manager of cafes. Moreover, the ruling of the court in excluding that testimony at the instance of the defendant was right. What plaintiff had been able to earn as seamstress and manager of

cafes two and one-half years before she was hurt and four years and eleven months before the trial was too remote, under the authorities. Railroad v. Mayday, 188 Ill. 308; Hubbard v. City, 60 Iowa 400; Peterson v. Traction Co., 65 Pac. 543.

FOX, J.—This cause is now pending in this court upon appeal on the part of the defendant from a judgment of the circuit court of the city of St. Louis in favor of the plaintiff for the sum of $12,000.

Plaintiff, at the time she received the injuries complained of in this action, was a young married woman, twenty-nine years old, and at the time of the institution of this suit she was still under coverture. Her husband died in July, 1903, pending the suit. After his death the plaintiff filed an amended petition which charged that defendant was a Missouri corporation, engaged as a common carrier of passengers by operating electric cars on the streets of St. Louis, and more particularly on double tracks on Grand avenue, which latter street intersected with Finney avenue; that on September 4, 1902, she was riding as a pay passenger on one of defendant's Grand avenue cars and was entitled to a very high degree of care and diligence in being carried safely; but that "defendant so carelessly and negligently conducted itself that a car in which plaintiff was riding was caused to collide with another car belonging to defendant upon Grand avenue, near its intersection with Finney avenue, whereby plaintiff was thrown down, causing serious injuries to her back, arms, legs, hands, kidneys, spinal cord, nervous system and brain, and also causing many bruises, wounds and contusions upon her body, head, spinal column, abdomen, breast and limbs, on account of which said several injuries plaintiff has been confined to her bed ever since said injuries, and has suffered excruciating physical pain and mental anguish and will in all reasonable

probability continue to suffer such bodily pain and mental anguish for the rest of her life, and will during the remainder of her life remain a confirmed invalid.

"That at the time said injuries occurred and this suit was begun, plaintiff was a married woman, but on the 1st day of July, 1903, her husband departed this life, and she is now a single person; that since July 1, 1903, she has incurred and will be compelled to incur in the future large sums of money for medical and surgical treatment, the amount whereof she is unable to ascertain, and that she has been and will be compelled to incur large sums of money for medicines and nursing on account of her said injuries, the amount whereof she is unable to state; that before her said injuries she was a strong, healthy, vigorous person, capable of earning at least fifty dollars per month, and would and could have earned that sum per month ever since July 1, 1903, and in the future, had she not been injured as aforesaid by the said negligence of the defendant, and that her loss in earnings ocasioned by her said injuries in the future will equal at least six hundred dollars per year for the remaining part of her life, as she is a confirmed invalid, and from the nature of her injuries she will, in all reasonable probability, never be better.

"Wherefore, plaintiff says she has sustained damages in the sum of thirty thousand dollars, for which and costs of suit she prays judgment."

The answer of the defendant consisted of a general denial.

The facts developed at the trial of this cause on behalf of the plaintiff were substantially as follows:

On September 4, 1902, plaintiff was a passenger on a north-bound car operated by defendant on Grand avenue, returning home from the Delmar race-track about six o'clock p. m. Defendant had two tracks on Grand avenue, one for north-bound cars and the other

for south-bound cars.  Finney avenue intersects Grand avenue and a track ran into Grand from Finney avenue, connecting with said north-bound track by a switch.  As the car upon which the plaintiff was a passenger approached Finney avenue another car operated upon Grand avenue by defendant, running from the northern to the southern part of the city, was approaching Finney avenue.  These cars were running at a rapid speed, but slowed down as they came to the Finney avenue crossing.  Both cars "started off again," as one witness describes it, and the car upon which the plaintiff was being carried, instead of continuing northward, turned on the Finney avenue switch westwardly and collided with great force with the south-bound car on Grand avenue, breaking the windows and somewhat disarranging the bodies of the cars on the trucks.  The car plaintiff was on was heavily loaded and she and many others were standing in the aisle.  The plaintiff was thrown to the floor of the car and under a seat of the car, and, after arising, walked, with assistance, to a near-by drug store and was afterwards driven to her home in a carriage.

The plaintiff, Carrie Davidson, testified in substance as follows:  That she is thirty years old and a widow, her husband died on the first day of July, 1903; that before she was hurt she enjoyed the best of health; that she had typhoid fever when she was a girl, about sixteen years old, but that she had no further serious illness that confined her to her bed before she was injured, except that typhoid fever. That on the 4th of September she had been to the Delmar track; took an Olive street car, paid her fare, rode east to Grand avenue, then took a Grand avenue car and rode north toward her home.  It was about half past five or six in the evening when the cars collided. "I was thrown to the floor to my knees, my stomach and abdomen against the side.  I was thrown back to

the floor and struck my leg violently and my back, my left hip, and between my shoulders and left arm and back of my head, I couldn't get up, I was-wedged under the seat with my head pressed to my chest. I was assisted to the drug store and placed on a settee, I believe; I was driven home in a carriage." Plaintiff testified that she was assisted to the carriage but did not know the persons who assisted her. Her husband took her out riding in a storm buggy the last of April or the first of May, 1903; she was bolstered up with pillows; she was out but a short time; her husband and mother assisted her down the stairs and when she got back her mother and husband assisted her up stairs; that the next time she went out of the house after she was injured was in July, 1903, at her husband's funeral; she was carried downstairs; they placed pillows in the carriage and wrapped her up; after the funeral her two brothers carried her upstairs to her room. The next day after the accident plaintiff testified that she suffered great pain; the shock and jar having caused flooding; that she was suffering pain all over her body, in her abdomen, back, shoulders, head, arms, left hip and thigh, and that her whole body ached; that she continued to grow worse, suffered pain all over her body; hot irons had to be put to her feet, and that she could not raise her head. "My eyes, my limbs, my whole body ached, my back, shoulders, hips and sides. I swelled to an enormous size, the girth of my body was twice the size it would have been in its normal condition." Being inquired of about her condition in the winter of 1902-3 she repeated her former testimony, ending by saying: "My whole body ached." Her husband had taken her out in the air two or three times, once in June he assisted her to a street car; he held her in his arms, rode down town and back and she was carried upstairs; that her swelling had decreased some but she was still suffer-

ing pain in different parts of her body; that she had spasms and at such times would suffer excruciating pain, and would become unconscious a few minutes and her whole body ached; that her body would become rigid and the after-effect was exhaustion, and for three or four days she would not be able to move; that after her last trial she had been confined to her bed for days and could not raise a limb or move, suffering pain all over her whole body; that her head, back and stomach were cold; that she had no use of her limbs, they refused to sustain the weight of her body.

"Before you were hurt I will get you to state what work you were able to do? A. First I was employed as a seamstress—

"Defendant's counsel objects to this testimony as incompetent under the pleadings.

"The Court: Do you say that under the pleadings her right to recover earnings is not in issue, is that your position?

"Mr. Jourdan: No, sir; I say it is improper for him to attempt to prove her earning capacity in 1899 and then skip a period of three years.

"The court overrules the objection; defendant at the time duly excepts.

"Question read, counsel adding: And what were you able to earn?

"Mr. Jourdan: I want to renew my objection to the question as now asked which covers the question of earnings. The first question, I understood, did not cover the question of earnings.

"The Court: I am ruling on the question as it was originally asked.

"Mr. Taylor: Just strike out about the earnings. Before you were hurt I will get you to state what work you were able to do?

"Mr. Jourdan: I object further on the ground that it is wholly indefinite as to time.

"THE COURT: You had better make it more specific as to time. That objection is well taken.

"Mr. Taylor: Say from 1899 down to the time you were hurt?

"Defendant's counsel states that he makes the same objection as for the same reason; objection overruled; defendant at the time duly excepts.

"A. I did all my own housework, washing, scrubbing, sweeping, everything in my household duties.

"Q. Now, I will get you to state immediately before you were married, say in 1898 and 1899, what you were able to do, that is, do as a single woman?

"Defendant's counsel states that he makes the same objection and for the same reason; objection overruled; defendant at the time duly excepts.

"A. I was employed at times as general manager of cafes, took full charge, had as high as from fourteen to sixteen girls working under me.

"Defendant's counsel objects to the answer as far as it has gone as not being responsive to the question; objection overruled; defendant at the time duly excepts.

"Q. What were you able to earn and what did you earn in that capacity?

"Mr. Jourdan: I move to strike out that answer for the reason, first, it is not responsive to the question; and second, that it does not tend to prove any fact in the case, as wholly incompetent and immaterial, and third, that her earning capacity since the death of her husband last year cannot be shown in that way, her earning capacity or ability to work in 1898 or 1899.

"The court overrules the motion; defendant at the time duly excepts.

"Question read.

"Defendant's counsel objects to the question for

reasons stated in the motion just made to strike out the former answer.

"THE COURT: I think that objection is well taken for another reason: we have to deal only with the present and future; the jury cannot consider anything respecting her power of earning since her husband's death."

Upon cross-examination the record discloses the following:

"Q. Are you now able to answer these questions loud enough for the jury to hear you? A. I am talking as loud as I can; my heart hurts me now to talk.

"Q. Have you been able to talk louder than this during any portion of the last month? A. I don't know as I have; I generally talk always the same without straining my voice.

"Q. Did you speak in such a tone of voice before the injury? A. No, sir; certainly not; my voice was very strong; I could speak as good as anybody did.

"Q. Have you been able to talk louder than this to Dr. Butler when he attended you last week? , A. Not as I know of.

"Q. Mrs. Davidson, while you have been testifying you have been sitting in a rocking chair padded with pillows, have you not? A. Yes, sir.

"Q. With your feet raised and put in another chair just directly in front of you? A. Yes, sir.

"Q. The stenographer of the court has been moved from his customary place down to the counsel table within two or three feet of you, has he not? A. Yes, sir."

Witness did not know that her counsel sits within a foot or two of her left; could not see any portion of his body, and did not know that her mother sat immediately behind her and had been holding her head and wiping her face during her examination in chief;

that she felt something on her head but did not know whether it was her mother or who it was, that she could not see "back there." Plaintiff further testified that she did not know how she got out of the car, whether at the front or the rear, and could not recall whether she went out of the car alone or was assisted. "I believe I was assisted to the car." "Q. Do you mean to the drug store?" "A. I don't know what you are talking about." The question being explained to her she answered: "If I walked I must have been assisted." Witness finally stated that she believed she was assisted by one or two men, may be more; she did not know either of them; thought she saw one of them since. Sometime during the evening Dr. Simon called; she was alone at the time; she admitted Dr. Simon but denied carrying a lighted lamp downstairs; after admitting the doctor she returned to her room, but stated that it was all she could do, she was aching. On this visit Dr. Simon dressed her knees; the following day he dressed her wrist and continued to visit her until the 2d of December. From the time she was injured until the 2d of December her mother remained with her at night, her husband being at work. When Dr. Simon was discharged on the 2d of December and Dr. King called in her mother was sent for and had remained with her ever since. Dr. King was never present at any of her spasms; she intended sending for him but regained consciousness and did not send, as he had left medicine to take. On being asked if she used the back stairway at her home, replied: "I don't remember, I believe I did try to go down once." She further stated that she had gone down this stairway on crutches and sat on the back porch a few times. On reexamination witness stated that she had paid out five or six dollars, sometimes a dollar or two dollars a week, for medicines and stimulants since the death of her husband in July, 1903.

Mrs. Jenkinson, mother of plaintiff, testified that at the time her daughter was hurt she (witness) had charge of the sewing at the Baptist Sanitarium; that prior to her injury plaintiff was in good health, had no sickness since she was sixteen years old; at that age she had typhoid fever for six or eight weeks, but had entirely recovered. Witness visited her daughter the morning after she was injured and remained with her continuously for five days; she then returned to her position but went back and forth every day until the 2d of December, 1902, when she resigned, and that since that date she had been with her daughter constantly and had taken care of her. The evidence of this witness is a substantial corroboration of that given by her daughter.

Dr. Robert M. Funkhouser testified that at the request of Dr. King he made an examination of plaintiff in September or October, 1903; examined her again on Wednesday or Thursday preceding the trial. On the first examination plaintiff was in bed and witness found some slight fluid in the abdominal cavity; he then had plaintiff sit up and on experiment found that her tendon reflexes were exaggerated. This examination was made by making a hammer of his hand and striking the lower part of the knee cap. He stated that he found a slight discharge from the left eardrum, and that the left drum-head was ruptured; that plaintiff seemed to be in pain and gave evidence of neurasthenia—formerly called nervous prostration. That plaintiff claimed to be suffering pain and moved about apparently with difficulty; her face flushed and her pulse was rapid and weak. On the examination made last week witness discovered an increase in the knee jerk on the right side; on the left there was a little difference. That plaintiff's pharynx was somewhat less than it should be in a normal state of health. Her body, judged of by subjective symptoms, was not as

sensitive as it should be to a sense of touch; during this examination witness stated that there was a rapidity of pulse, depending somewhat on the amount of the examination. Tender spots were found, judged of from what she said, over the pit of the stomach and over the region of the ovaries; that during the examination her pulse ran all the way from 100 to 125. "There was considerable flushing of the face, the neck. I also noticed that there were tremors, especially tremors in the right hand; also a sort of vibratory movement of the right leg. I asked her to get up. I refused to let anyone assist, because I wanted to see whether she could or not, and she did so with a great deal of difficulty. I had her pass from the side of the bed; she caught hold of a chair and the furniture for support and there seemed to be a difficulty in raising her back. There were some symptoms—and sometimes it is a very difficult matter to determine them in these cases—of neurasthenia, or trauma; there were symptoms of what we call sclerosis, which is a change taking place in the gray matter of the cord.

"Q. You would hesitate to say they were temporary? A. Yes, sir. I would not like to say they are permanent, and I have greater hesitancy in saying that they are temporary. It is a difficult matter, your Honor, to decide these questions, because we find so many elements that enter into a case of what we call traumatic neurasthenia or hysterio-neurasthenia, for sometimes after a number of years have elapsed, say four or five, the patient does get better.

"By the COURT: I suppose another difficulty that you encounter is that these symptoms are chiefly subjective symptoms? A. They are subjective symptoms; sometimes they may become objective, depending on the effect that the shock may have on the different organs of the body.

"By Mr. Taylor: Q. Suppose that up to the 4th

of September, 1902, this lady had enjoyed robust
health, had very excellent health; suppose on that day
she was in a collision of cars where they came together
with great force and she was thrown to the floor of
the car, receiving bruises on the abdomen, injury to
her back and head, and suppose afterwards she was
confined to her bed and developed symptoms—the
symptoms such as you have described followed, would
that shock, physical and psychical, produce those symp-
toms? A. I would consider that it would be suffi-
cient.''

Upon cross-examination Dr. Funkhouser admitted
that he had directed the attending physician's atten-
tion towards Bright's disease; said it was usual for
physicians to send specimens of the urine to a specialist
for analysis, and that he had made no such examina-
tion. Witness further stated that in his first examina-
tion he had discovered a symptom of kidney trouble
in that there was some slight water in the abdominal
cavity, but in his last examination he did not think he
discovered any.

Dr. Robert M. King testified that he treated plain-
tiff from December 2, 1902, down to the date of the
trial, the 17th of March, 1904; that he had been ac-
quainted with her for several years before she was
injured; that before her injuries her health was good;
that he saw her in the latter part of August, 1902, and
within a week of the time she was injured, and that
she was in good health; that at the time he took charge
of her case "she was in a state of great nervous pros-
tration, with an irregular heart and irregular pulse,
with considerable pain over her body, complained of
a great deal of sleeplessness, had not been able to
sleep for some time and had continued insomnia; there
were considerable exaggerated reflexes, especially in
the knee-joint; a good many motor disturbances, some

other sensory disturbances with an unequal pupil, the pupil was unequally contracted; with a good deal of vasomotor disturbances, I mean by that, disturbances of the vessels in which there were cold extremities inclined to perspiration, a good deal of sweating at times, with more or less depression following; her condition was evidently, in my judgment, what is denominated as railway spine, a condition that follows shock, the result of shock, both physical and psychical, mostly psychical, though, in her condition, I think. I found her abdomen very much enlarged, and I found distinct fluctuations on percussion of the abdominal walls; that condition existed for some time and she gradually got better of that condition. There is a little fluid in her abdomen now, hardly perceptible, some little trace of it yet; there is a good deal of tenderness over the abdomen; some little tenderness in spots over the spine; my judgment is that her condition was not improved; I don't mean to say that some of her symptoms have not improved, that dropsical effusion into her abdomen has improved and at times she seems to be some better, and, at other times, worse; but as a general thing her condition is unfavorable.'' Witness stated that he had made frequent examinations of the urine and found it usually normal; found no condition that indicated any change organically, but stated that he suspected sclerosis of the kidneys taking place. He defined sclerosis to be ''a hardening;'' said that he did not state that it existed, but that the kidneys did not act regularly, and that judged from the reflexes, in his opinion there was some irritation of the spinal cord. ''She has very little ability to help herself. She has but poor use of her limbs; lying down she used her limbs all right, but with an effort to get up there is considerable disturbance of the motor powers.'' This witness answered a hypothetical question the same as the former witness, Dr. Funkhouser, that is, assuming her age

and health, the collision and resulting bruises, narrated, etc., such injuries and shock would be an adequate cause to produce the symptoms he found existing in plaintiff's case. "Q. Now, please state whether, in your opinion, her injuries are permanent or of a temporary nature? A. Well, I will answer that in this way—in the majority of all the cases the result of railway spine, shock and phases subsequently developing of neurasthenia and hysteria, they get well; the majority of all the cases get well; they get well even after some years' duration, when all excitement and worry has been removed, but there is another phase of railway spine that develops and indicates an organic lesion in which these cases go from bad to worse, and, in my opinion—of course I am not going to give an opinion based upon absolute knowledge, for I have not got it, but in my opinion, there is an evidence of a progressive change going on here now. Q. For the worse? A. For the worse, a change indicating a sclerosis of the spinal column."

Witness further testified that his charge for treating plaintiff since the death of her husband was about $100.

Upon cross-examination witness said that he had noticed no change in plaintiff's condition since her case was reset for trial, except that she had worry and anxiety and a good deal of depression; to a certain extent that would be occasioned by the litigation, and in his opinion, after the worry and excitement were over her condition would improve; that plaintiff's environment and associations would have something to do with the improvement; that he would not say she would improve but would say a large majority of cases do improve; that he made an analysis of her urine and found no albumen or sugar in it, and that he found no positive evidence of Bright's disease. Witness further stated that the dropsical condition he found could

result from organic trouble of the kidneys or heart.

The evidence on behalf of the defendant was substantially as follows:

Dr. Simon testified that during the year 1902 he was employed by the defendant; that he went to see plaintiff on the night of her injuries and that on his ringing the front door bell, plaintiff came down stairs and let him in; that she carried a lamp or light in her hand; that she returned upstairs without assistance; witness was in the neighborhood of the accident and one of defendant's claim agents directed him to see Mrs. Davidson.

Dr. Weinsberg testified that he visited plaintiff in December, 1902, at the request of two attorneys (not plaintiff's present attorneys) who claimed to represent plaintiff at the time. Witness testified that he examined plaintiff twice; the first time he found her in bed; that he was not able to find any symptoms of any organic disease; that he examined her urine; on his second examination he testified that he was not able to find any organic trouble, or any symptoms of any organic trouble, found her "just in a nervous condition," and there was no sign of any affection of the spine and no sign of any fractures.

Dr. Baumgarter testified that he made a chemical and microscopical examination of plaintiff's urine and found a small quantity of albumen; that this might indicate Bright's disease. He found a "very few casts." Presence of casts indicates the presence of Bright's disease; that in his opinion the condition in which he found the urine could not result from spinal trouble of any character.

Dr. L. P. Butler testified that on March 2, 1904, he was, by order of court, appointed to make a physical examination of the plaintiff; that he found her in bed, and that the thing that impressed him mostly was her nervous symptoms. He examined each of her organs

separately and collectively, and examined her urine. He found her heart in fairly good condition, her liver and spleen and abdomen normal, and her eyes normal. Plaintiff complained of sore throat; witness examined her throat, found evidence of chronic catarrhal condition; and found her lungs in good condition; that he sat in the court room about twenty-five feet from plaintiff while she was testifying and could not hear what she said. Being asked to tell the condition of her voice on the day he examined her, he said he was seated by her bedside and had no trouble hearing her; he did not remember of her complaining of a weak voice; he saw nothing in the condition of her heart or lungs to indicate that she could not speak so as to be heard like any other person. He found albumen in her urine; that indicated inflammation of the kidneys, that is, Bright's disease; found casts in her urine and that would indicate a degree of inflammation or Bright's disease. Plaintiff complained of being troubled with a swelling of the abdomen; that he examined for evidence of some inflammation, found nothing except a tear of the mouth of the womb, due to a miscarriage or abortion. Plaintiff first told witness she had never given birth to a child; when he found evidence of a delivery he said to her: "You must have had an abortion or miscarriage," plaintiff answered, "Yes, a long time ago." He testified that no external blood would produce the injury found at the mouth of the womb. Plaintiff told witness she always had good health prior to the collision, except a spell of scarlet fever.

Upon cross-examination Dr. Butler testified that he did not mean by abortion that any improper means had been used to anticipate birth; that the difference between a miscarriage and abortion was that an abortion occurred prior to the beginning of the fourth month; after that, a premature birth was called a miscarriage. That miscarriages sometimes impaired the

health, but that if a woman was healthy for years afterwards it indicated that such misfortune did not impair her health. "Q. Suppose a woman thirty years old, enjoying the very best of health, is involved in a railway collision when standing and is thrown to the floor and receives bruises on her back, neck, shoulders and abdomen, and suppose she is left in that highly nervous state confined to her bed, and after a while a dropsical condition sets in so her body is swollen nearly twice the ordinary size, and suppose she is left in a highly nervous state, would an injury such as I have described be any cause to produce that condition? A. It would produce the nervous condition." Witness further testified that where there was a physical and psychical shock it was likely to produce nervousness and injury to the person, depending on the extent.

On re-examination witness stated that when he examined plaintiff she sat up and walked; that he asked her to turn over in bed; she said she could not move; that afterwards her mother helped her to turn over, but her limbs did not move, and her mother helped her to turn her limbs. After he had finished his examination he turned plaintiff back in bed with the assistance of her mother. One of her limbs was left uncovered. Her mother left the room to get a towel and plaintiff complained of being cold; witness told her to bring her limb in and he would cover it over; that she moved it in as quickly as a person would ordinarily move one foot; witness testified to other natural movements of her limbs. He did not notice her move her hands or arms much; when she walked she used crutches and she was brought to the edge of the bed with the assistance of her mother. When she sat down in a chair she put her arms down and moved herself back. Dr. Butler found some sensitiveness along the column of the spine, but not a great amount, this was in the cervical region and lumbar region; this sensitive-

ness was disclosed by the complaint of plaintiff when each vertebra of the spine was pressed.

On recross-examination witness stated that it was plaintiff's left foot that was exposed and which she drew in; that her mother assisted her off the bed and to get on crutches, but did not assist her any on the crutches, and that she moved some six or eight feet and eased herself down on the edge of a chair. Dr. Butler was asked by defendant's attorney whether plaintiff's injuries, in his opinion, were permanent; he answered that there was nothing to indicate a permanent condition as he found her—nothing to indicate a permanent injury. Witness made the same answer to a question in regard to her nervous condition. When questioned by plaintiff's attorney as to whether she would recover quickly, he answered that he would not state the time; that in the absence of any symptoms of organic condition "she may have hopes of regaining, not her health entirely, but a confortably good health, it depends a great deal upon the environment she is placed in, the surroundings. Q. And even then, in your opinion, it might take her a number of years? A. Well, no; sometimes the change is very rapid. Frequently so."

Mrs. Wm. Bloyd testified that she occupied the flat below plaintiff; that she had seen plaintiff standing at the front door; had seen her standing on the front porch; saw her going down the rear stairway and out through the alley, the backway; that she had also heard plaintiff talk from the flat above and could hear her distinctly below.

Plaintiff testified in rebuttal that she did not employ the attorneys who sent Dr. Weinsberg to examine her; that the only attorneys she had ever had were her present counsel.

At the close of the plaintiff's testimony defendant requested an instruction in the nature of a demurrer

to the evidence, which instruction was by the court refused, to which action of the court defendant duly excepted. This request was renewed at the close of all the evidence, and being by the court denied defendant duly excepted.

The cause being submitted to the jury they returned a verdict finding the issues for the plaintiff and assessing her damages, as heretofore stated, at the sum of $12,000. Timely motions for new trial and in arrest of judgment were filed and by the court overruled. Judgment being entered in conformity to the verdict, defendant prosecuted its appeal to this court and the record is now before us for consideration.

## OPINION.

The errors complained of, as indicated in the record before us, may thus be briefly stated:

1.   The court erred in giving plaintiff's instruction No. 1.

2.   The court erred in giving plaintiff's instruction No. 2.

3.   The court erred in refusing to set aside the verdict as being excessive.

## I.

Upon the complaints directed to the declarations of law numbers 1 and 2, we will, in the treatment of them, reverse the order and discuss first the legal propositions applicable to instruction number 2. This instruction, which was to guide the jury in assessing the damages which plaintiff was entitled to recover, was as follows:

"2.   The court instructs the jury that, if under the evidence and instructions of the court, they find in favor of plaintiff, they should assess her damages at such sum as they believe, from the evidence, will be a fair compensation to her for the pain of body and

mind, if any, which she has suffered, occasioned by her injuries in question, and for such pain of body and mind as in all reasonable probability she will suffer in the future, if any, occasioned by said injuries, and for such permanent injury, if any, to plaintiff's body and mind, as they may find were occasioned by said injuries, and for such probable impairment of earning capacity in the future, if any, as the jury believe were occasioned by said injuries, and for such sum, if any, as plaintiff has reasonably incurred for medical attendance occasioned by her injuries in question since July 1, 1903.''

In our opinion this instruction was manifestly erroneous in submitting to the jury as one of the elements in assessing the damages sustained by the plaintiff ''her probable impairment of earning capacity in the future,'' for the reason that there was no testimony upon which to predicate such an instruction. There is an entire absence from the record now under consideration of any testimony whatever tending to show what the plaintiff was able to earn prior to receiving the injuries complained of; hence we are unable to conceive in what way the jury could fairly compensate her in damages for impairment of earning capacity in the future, if they were absolutely without any knowledge of her earning capacity prior to the infliction of any injuries alleged in the petition.

It must not be overlooked that plaintiff, in her petition, specifically alleges what her earning capacity was. It is there averred that ''before her said injuries she was a strong, healthy, vigorous person, capable of earning at least $50 per month, and would and could have earned that sum per month ever since July 1, 1903, and in the future, had she not been injured as aforesaid by the negligence of the defendant.'' The conclusion is irresistible that the instruction complained of, in which the impairment of plaintiff's earn-

ing capacity was submitted to the jury, was predicated upon the allegation in the petition as above suggested. In other words, plaintiff averred that her earning capacity was at least $50 per month and this instruction authorized the jury to compensate her in dollars and cents for the alleged impairment of her capacity to earn such amount. We are unwilling to say that without any proof of what her earning capacity was prior to her injuries the jury had the right to guess or conjecture what her earning capacity in fact was and how much such earning capacity was impaired by reason of the injuries complained of. In our opinion it would be an unsafe precedent to say that the jury should be permitted, without the slightest proof of earning capacity, either before or subsequent to the accident, to consider as an element of damage, upon the mere proof of age and the good health and strength of the plaintiff, the loss of earning power predicated alone upon the individual opinions entertained by the respective members of the jury.

In treating of this proposition Judge THOMPSON, in his work on Negligence, vol. 6, sec. 7307, states the rule in this language: "Generally loss of earning power can only be considered as an element of damages where there is evidence from which the pecuniary extent of such loss may be estimated, and where plaintiff asks damages because of his diminished earning capacity, but gives no evidence of his capacity before or after the accident, the question of such damages should not be submitted to the jury."

The rule as applicable to this question is very clearly stated in Voorhies on Measure of Damages, sec. 54. In discussing this question the learned text-writer said: "The burden of proof is upon the plaintiff to show that the injury has diminished his capacity to earn a living. How this may be done depends upon the nature of the injury, its effect upon the

earning capacity, and the loss which is sustained thereby. It is proper to show the injured person's previous physical condition and ability to labor and follow his usual occupation, as well as his condition since the injury, to enable the jury to properly find the pecuniary compensation to be awarded for the loss of earning power. The evidence should show the age and situation of the injured party, his earning capacity, and its probable duration, the loss sustained by the injury to his earning power, and the extent to which he is disabled from earning a support for himself, on account of such injury. The law fixes the burden upon him who claims the damages from another as a compensation for a pecuniary loss to furnish facts necessary to ascertain the extent of his loss with reasonable certainty, and failing in this, he is entitled to no more than nominal damages. In the absence of proof of the value of plaintiff's time while laid up from the injury, and how much he was capable of earning before the injury, there is no basis upon which the jury can estimate his future damages, on account of impairment of his power to earn money by reason of his injury.''

In Duke v. Railroad, 99 Mo. 347, it was expressly ruled by this court that ''where compensatory damages only are given, the recovery must be confined to the actual damages sustained. And when such damages are susceptible of proof with approximate accuracy, and may be measured with some degree of certainty, they should not be left to the guess of the jury, even in actions ex delicto. When so left, it is impossible to tell to what extent the verdict may have been affected by the vague estimates the jury may have placed upon values concerning which there was no proof.''

In Slaughter v. Railroad, 116 Mo. 269, it was averred that the injury was permanent and would render plaintiff a cripple for life. Upon this allega-

tion it was sought to introduce evidence as to the loss of time and earnings, but such evidence was by the court excluded upon the rule as announced in Mellor v. Railroad, 105 Mo. 455; Coontz v. Railroad, 115 Mo. 669, and Pinney v. Berry, 61 Mo. 359; however, notwithstanding the exclusion of the testimony in that case, the trial court submitted to the jury the element of damage occasioned by the loss of time, about which there was no proof. Judge GANTT, speaking for this court, said: ''Having excluded the evidence, we think it manifest the instruction is erroneous in that it authorized damages of which there was no allegation, and no evidence.'' In further discussing the propositions involved in the instruction, he said: ''The distinction sought to be made between 'loss of time' and 'loss of earnings for that time,' does not exist, in law. The damages to be awarded in either case is the pecuniary value of the time lost, and either expression sufficiently indicates the measure. In common acceptation they are one and the same thing: We think on principle this instruction, upon the facts of this case, is even less defensible than that which was disapproved in Duke v. Railroad, supra. It is much more reasonable to assume that a jury would be familiar with the value of a physician's bill, from their own knowledge and experience, than they would be with the value of the time of a merchant of whose business they knew absolutely nothing save that it was a 'furnace and tin business.' Not a word of evidence is to be found as to the amount of capital invested; nor whether it was a profitable business, and, if so, to what extent; nor to what extent, if any, the business suffered by the injury to plaintiff's wrist. As said by BRACE, J., in Duke v. Railroad, 'When such damages are susceptible of proof with approximate accuracy, and may be measured with some degree of certainty, they should not be left to the guess of the jury, even in actions *ex delicto*.' If re-

versible error in that case, *a fortiori* it is reversible error in this.''

In O'Brien v. Loomis, 43 Mo. App. 29, the trial court embraced in one of its instructions and submitted to the consideration of the jury the element of damages occasioned by the loss of earnings. The appellate court in a very brief way disposed of the error complained of in that instruction. It simply stated that it was conceded that there was no evidence tending to show what plaintiff's earning capacity was, or how much time she lost in consequence of the injury; therefore, it was held that the giving of that instruction was erroneous.

Substantially the same rule is announced in Mammerberg v. Railroad, 62 Mo. App. 563, and Stoetzle v. Sweringen, 96 Mo. App. 592.

In McHugh v. Schlosser, 159 Pa. St. 480, it was sought to have included in the assessment of damages the loss to plaintiff of earning power. It was ruled by the appellate court that when the probable earnings of deceased are to be taken into account in fixing the damages it is the duty of the plaintiff to show the earning power of the deceased or give such evidence in regard to his business, business habits and past earnings as may afford some basis from which earning capacity may be fairly estimated. There was a verdict for the plaintiff and the court in its final conclusion said: ''It will not do to permit such a verdict without some evidence from which the calculation of the pecuniary loss of the plaintiff may be made,'' and the judgment in that case was reversed.

The law applicable to this proposition is nowhere more clearly stated than in McKenna v. Citizens' Gas Co., 198 Pa. St. 31. The court in treating of this question used this language: ''The seventh assignment relates to a part of the charge devoted to the question of damages. The learned judge in his charge said:

'In determining damages for personal injuries result-
ing from negligence you will allow ............ for
pecuniary loss he (the plaintiff) has sustained, and is
likely to sustain, during the remainder of his life, from
his disabled condition. When we speak of pecuniary
loss we refer to earning power, what he was able to
earn, or likely to be able to earn, and such loss as he
might sustain of being unable to continue the exercise
of that earning power.' The probable earnings of the
plaintiff, therefore, was an element to be considered
in determining the damages recoverable in the action.
It was conceded, and so stated in the charge, that there
was no evidence in the case as to the earning power of
the plaintiff before or after the accident; yet the court
directed the jury to take it into consideration in de-
termining the damages. This was error. As the plain-
tiff asked damages by reason of his diminished earn-
ing capacity, it was his duty to introduce testimony
from which the jury could ascertain such damages.
Failing in this, the learned judge should not have sub-
mitted to the jury as a basis for their verdict the pe-
cuniary loss to the plaintiff occasioned by the injuries
received in the explosion.''

Our attention is directed by respondent to the case
of Perrigo v. St. Louis, 185 Mo. 274, and it is earnestly
insisted by learned counsel for respondent that the con-
clusion announced in that case is decisive of the prop-
osition now under discussion. We are unable to give
our assent to this contention upon this proposition so
ably presented by counsel for respondent, and in our
opinion the case of Perrigo v. St. Louis falls far short
of furnishing decisive support to such insistence. That
case can be clearly distinguished from the cases cited
in support of the contention of appellant. In fact, a
careful analysis of the Perrigo case will demonstrate
that the learned and esteemed judge who wrote the
opinion clearly pointed out the distinction between the

case he had in hand and the numerous other cases. which are herein suggested. In that case it will be observed that the instruction in judgment before this court, and which was approved, directed the jury that if they found the issues in favor of the plaintiff they might take into consideration the fact that the injuries were of such a character as diminished the ability of plaintiff to work or labor. In the case at bar it is sought by the direction to the jury to have them compensate plaintiff for impairment to her earning capacity in the future. It is said that the language employed in the instruction discussed in the Perrigo case and the terms used in the case at bar mean the same thing. We are unable to agree to this insistence. There is a marked distinction in the two cases as to the questions submitted to the consideration of the jury. To fully appreciate the distinction between these two cases it is well to keep in mind the foundation upon which plaintiff predicates her right to have the jury consider the element of damages now under consideration. It is specially averred in the petition what her earning capacity was before the injury and what it would be in the future if she had not received such injury, and there can be no escape from the conclusion that the instruction challenged in this cause is based upon such specific allegation, and it plainly tells the jury that they may compensate her for any impairment of such earning capacity. In other words, it in effect tells the jury that plaintiff claims that her earning capacity was at least $50 a month prior to the receipt of the injuries, and if you find from the evidence that by reason of the injuries received she is only able to earn a much less sum, then you are authorized to compensate her for such impairment to her earning capacity.

It will be observed in the Perrigo case that the jury are not directed that they are authorized to com-

pensate plaintiff for any diminished ability to work or labor caused from the injuries received, but the jury are simply told that if by reason of the injuries the ability of plaintiff to work or labor has been diminished they may take such fact into consideration in assessing the amount of her damages.

The one case proceeds upon the theory that to impair the ability of plaintiff to work or labor is, as was said in the Perrigo case, an injury to a personal right wholly apart from any pecuniary benefit that might be derived from the exercise of the power to work or labor, and being a personal right affecting her person, that it was legitimate and proper for the jury in assessing the damages to take such fact into consideration. That is not this case. The court in the case at bar did not limit the consideration of the jury to the mere impairment of the power to work or labor, which was a personal right, but the instruction in effect directed them that they were authorized to compensate her for any loss of pecuniary benefit that might be derived from the exercise of the power to work or labor. This court, in discussing the instruction challenged in the Perrigo case, speaking through Judge Brace, fully recognized the marked distinction in the cases to which we have made reference. He said: "The jury were not authorized by the instruction in the case to allow damages for loss of time or services. They were simply told in determining the extent of her injuries they might take into consideration any diminution of her power to work. To impair the power of any person, whether of body or mind, is an injury to personal right wholly apart from any pecuniary benefit that might be derived from the exercise of the power."

Chief Justice Bleckley, in Railroad v. Jacobs, 88 Ga. l. c. 652, clearly pointed out the reason which justifies the trial court in authorizing the jury in as-

sessing the damages in a personal injury case to take into consideration the deprivation or impairment of the power to work or labor. His views, however, in no way conflict with the distinction we have pointed out between the Perrigo case and the case at bar.

Emphasizing the correctness of the conclusion that this court in the Perrigo case recognized the distinction between an instruction which merely authorized the consideration of a fact that the plaintiff's ability to work was diminished and one in which the jury were authorized to compensate the plaintiff for impairment to earning capacity, we find cases from the Courts of Appeals in this State which clearly point out the distinction unqualifiedly approved and the views of such court quoted with approval. ELLISON, J., in Cullar v. Railroad, 84 Mo. App. l. c. 346, thus discussed the proposition: "The husband is allowed to recover for the loss of his wife's services, and she cannot include in her damages any loss of time wherein she might have rendered him service. But that will not prevent her from recovering for all those things which injure her, apart from a mere loss of service and society to which the husband is entitled. Physical disability is a personal loss apart from being a deprivation of a money-earning power. In Plummer v. Milan, 70 Mo. App. 598, and later in Wallis v. Westport, 82 Mo. App. 522, we held it improper to direct an allowance for damages for a married woman's inability to perform her ordinary avocations of life. But this does not prevent her recovering for a physical disability which may perhaps be a constant source of discomfort, inconvenience and annoyance."

In announcing the final conclusion in the Perrigo case this court said: "Human nature is so constituted that physical labor in some form is essential to health and happiness and to be deprived of the power to work

is one of the most serious personal injuries, independent of the pecuniary benefits that such labor may confer, and from any standpoint, whether of statute or common law, a married woman like any other human being ought to be compensated so far as may be for such deprivation, if wrongful, and we do not think the court committed error in so holding in this instruction.''

In our opinion, the very terms employed in giving expression to the views of this court in that case to its final conclusion, clearly distinguish it from the case at bar.

Recurring to the instruction challenged in this case it will be observed that the court directed the jury to compensate the plaintiff in assessing her damages for impairment to earning capacity in the future, if there was any such impairment. We repeat, that we are unable to conceive upon what theory the jury were to compensate plaintiff for any impairment of her earning capacity, in the absence of any basis from which to calculate the amount that such earning capacity was impaired. It will also be observed that the right of the jury to allow compensation for the impairment of earning capacity was conditioned that they found that such earning capacity was impaired, and there being no proof as to what her earning capacity was, prior or subsequent to the injuries complained of, we are unable to escape the conclusion that this instruction in the particulars pointed out was a misdirection to the jury.

As further emphasizing the correctness of the conclusions reached upon this proposition, we find upon examination of the treatment of this subject by the text-writers heretofore referred to, they use the same terms or similar terms as are used in the instruction now under discussion, such as ''earning power'' and ''earning capacity,'' then they proceed to

discuss the proposition of the impairment or diminishing of such earning power or earning capacity, and apply the rules as applicable to the necessity of proof, as herein indicated.

This case does not fall within that line of cases to which our attention is directed where the earning capacity was not susceptible of proof. If plaintiff was entitled to compensation for any loss by reason of impairment to her earning capacity, what such earning capacity was is susceptible of reasonably accurate proof, and there being no proof upon that subject it must be held that the instruction was erroneous, and the giving of it constitutes reversible error.

## II.

Instruction No. 1, the correctness of which is challenged by appellant, is as follows:

"1. The court instructs the jury that it was the duty of the defendant, in conducting its business as a common carrier of passengers, as far as it was capable, by exercising a very high degree of care and foresight, to carry them safely, and the defendant is responsible for the injuries resulting to its passengers through the failure to exercise such care, and any failure on the part of the defendant to exercise a very high degree of care and diligence of a very prudent person in operating its cars would be such negligence as to make the defendant liable for any injury to the plaintiff resulting from such neglect, unless you further believe there was negligence on the plaintiff's part directly contributing to the injuries sustained by her, and in passing upon the question as to whether the defendant was or was not negligent in operating its cars on the occasion in question, you should take into consideration all the facts and circumstances as shown by the evidence to have existed at the time when, and the place where, the injury in question occurred,

and you should give to each fact and circumstance and to the testimony of each witness, such weight only as you may deem such fact, circumstance or testimony entitled to in connection with all the evidence in the case.''

The correctness of this instruction is challenged upon two grounds: First, that it assumes the existence of certain material facts which are essential to entitle plaintiff to recover, and which are put in issue by the answer, without submitting such facts to the jury and requiring them to make a finding upon such facts. Second, that the instruction is broader than the allegation in the petition charging negligence upon which it is predicated, and that it fails to limit and confine the consideration of the jury to the character of negligence which is specifically alleged in the petition. In other words, it is insisted that the negligence complained of in the petition of plaintiff was specifically alleged and that the instruction now under consideration fails to confine the jury to the character of negligence alleged, but authorized a recovery upon any ground of negligence whether embraced in the petition or not.

As this cause must be remanded for a new trial, as heretofore indicated in the discussion of the first proposition treated of, we shall content ourselves with briefly discussing the propositions presented by the respective counsel and giving some expression to our views as to the correct rules of law applicable to the subject in hand.

That the trial courts, under certain circumstances, may assume the existence of certain material facts, is well settled by a long line of decisions in this court. We have reached that stage under our system of jurisprudence, and it affords us pleasure to make note of this advanced step in the administration of the law in controversies in court, to apply to such litigated con-

troversies practical and business rules. We do not mean to be understood as holding that in all cases, upon the mere uncontradicted evidence of a witness or witnesses, the court would be authorized to assume the truth of their statements; but we do hold that, even though the facts be put in issue by the answer, where the testimony is absolutely uncontradicted and not a word of testimony offered to disprove the facts testified to by the witnesses, and during the progress of the trial it is made manifest to the judge presiding at the trial by the manner of the examination of the witnesses by counsel engaged in the cause that such facts are not to be treated as a real disputed question in the controversy, then and in that case the court would be authorized, without the commission of any error, in giving its instructions to the jury to assume the existence of such facts, which, during the progress of the trial, counsel by their conduct and manner had indicated were not seriously in dispute.

This court in the case of Fullerton v. Fordyce, 121 Mo. l. c. 13, speaking through MACFARLANE, J., announced the rule that "the court may in its instructions to the jury assume the truth of a proposition which is established by the undisputed testimony, but it is manifestly improper to do so where there is any conflict in the evidence," citing in support of the rule Hall v. Railroad, 74 Mo. 302; Barr v. Armstrong, 56 Mo. 589, and Caldwell v. Stephens, 57 Mo. 595.

In Taylor v. Iron Co., 133 Mo. 349, this court clearly indicated its views upon this proposition and it was there expressly held that it was not error for the court under certain circumstances to assume the existence of certain facts. One of the questions involved in that case was as to the injuries received by the plaintiff and the permanency of such injuries, and the court in its instructions assumed the existence of certain facts concerning the injuries and the perman-

ency thereof, and in discussing the proposition it was there said: ''This court has frequently held, to sustain verdicts rendered upon instructions wherein the trial court assumed the truth of a proposition or fact which has been established by unquestioned testimony of the party alleging it, and while not admitted by the adverse party in express words has been treated throughout the trial by him as existing, that no reversible error was committed by the court's assumption.'' Further discussing this question the reasons for the application of such rule in the trial of causes were plainly made manifest, and in assigning such reasons it was there said: ''While the question of plaintiff's injuries and the extent thereof was put in issue by the general denial set up in defendant's answer at the trial, the real contest was confined, so far as defendant's testimony went, to its entire non-liability. Not a word of testimony was offered to disprove any fact testified to by plaintiff or her witnesses as to the injury, its character, extent, and probable duration. During the entire progress of the trial, counsel for defendant, by the very manner of the examination of the witnesses, seemed to recognize and concede both the injury and the probable extent thereof, and sought only to avoid its consequences to his clients by endeavoring to show defendant's non-liability by reason of the unmanageable condition of the horse driven by defendant's servant, at the time plaintiff received her injuries. What all parties to a litigation treat and assume as a fact during the entire progress of the trial before the court, the court, without error, may assume for convenience in drafting its instructions to the jury, that the issue upon that fact has been withdrawn from the controversy, and confined to the narrow compass embraced within the radius of the testimony offered.'' To the same effect is Burlington First National Bank v. Hatch, 98 Mo. 376, and Pope v. Railroad, 99 Mo. 400.

GANTT, J., in speaking for this court in Gayle v. Missouri Car & Foundry Co., 177 Mo. 427, cited approvingly the case of Taylor v. Iron Co., supra, and expressly ruled that it was not error to assume the existence of a fact over which there was no controversy.

In the comparatively recent case of Sotebier v. Railroad, 203 Mo. 702, the cases of Hall v. Railroad, Barr v. Armstrong, Fullerton v. Fordyce and Taylor v. Iron Co., supra, were cited with approval, and it was clearly recognized in that case that this court had many times held that the trial court may in its instructions to a jury assume the truth of a proposition which is established by the undisputed evidence in the case. On the other hand, it may be that in the trial of a cause a witness or witnesses may testify as to some material fact and the opposite party is unable to introduce any witness to contradict their testimony, yet there is no question but what he has a right to challenge the credibility of such witnesses and have the court or the jury to whom the cause may be submitted, determine such fact. However, it is clear that the trial court can readily observe as to whether there is a serious and real dispute as to the credibility of the witnesses testifying or as to the existence of the facts to which they give testimony. It is but the common observation of all courts that counsel ordinarily in no uncertain terms indicate whether there is a real dispute as to certain facts involved in the proceeding, and the dispute, if seriously and really made, will always manifest itself during the progress of the trial in the examination and cross-examination of the witnesses and the instructions requested at the close of all the testimony.

It is manifest from the record before us in this cause that there was no dispute over the fact that the defendant was a carrier of passengers and that there

was a collision, and even though those facts were put in issue by the answer, if it was apparent to the trial judge during the progress of the trial that there was no dispute over those questions and both parties treated those particular facts as being in existence there was no reversible error in the court assuming the existence of such facts in its instructions to the jury.

The conclusion reached upon this proposition in no way conflicts with the conclusions reached in Gannon v. Gas Light Co., 145 Mo. 502. That case was simply one where the plaintiff by her testimony made out a prima-facie case of negligence against defendant. The proof offered by the plaintiff in that proceeding was adequate and sufficient to cast the burden upon the defendant of showing the non-existence of negligence on its part. Witnesses were then introduced on the part of the defendant whose testimony, if true, would rebut the prima-facie case of negligence made out by the plaintiff, but it must be observed that in that case the vital question submitted to the jury was whether the facts testified to by such witnesses were true, and at the close of all the evidence the defendant requested the court to instruct the jury that upon the pleadings and all the evidence the plaintiff could not recover. Counsel for plaintiff was there combating the propriety of such an instruction and the court refused to give it. That case clearly falls within that class of cases as heretofore indicated, where a party has a right to challenge the credibility of witnesses and have the question as to their credibility and the truth of the facts to which they give testimony passed upon by the jury, and that such facts were clearly in dispute in that controversy was plainly apparent upon the record. That is not this case. The examination and cross-examination of the witnesses during the progress of the trial in the case at bar clearly indicates that counsel were not seriously disputing the existence of

the facts of which they now complain in this proceeding as being assumed by the court in the instruction now under consideration; and it is somewhat a significant fact that learned counsel for appellant did not controvert the proposition that those facts were not in dispute in the trial until they reached the point of filing their reply brief to the brief filed by the respondent. In the original brief filed in this cause by appellant there is an entire absence of any complaint that the court in instruction number 1 erroneously assumed the existence of any of the material facts.

Emphasizing the correctness of the conclusion that the case of Gannon v. Gas Light Co., supra, is not to be regarded as in conflict with the views herein expressed upon the proposition under discussion, it is significant and worthy of note that the same judge who wrote the Gannon case also wrote the case of Taylor v. Iron Co., heretofore referred to and quoted from approvingly. It is obvious that the learned judge in the consideration of the Gannon case did not regard the final conclusion reached in that case as being in conflict with the Taylor case, and it is manifest that the two cases are clearly distinguishable upon the ground as herein indicated.

Upon the remaining proposition involved in this instruction, that is, that the instruction upon the subject of negligence is broader than the pleading upon which it is predicated, it is sufficient to say that the trial court in framing said instruction in that particular was unmindful of the well-settled rules of law as announced by this court applicable to this subject. A recovery in this action is sought upon the negligence which is alleged to consist in the defendant's so carelessly and negligently operating its cars that the car in which plaintiff was riding was caused to collide with another car belonging to defendant upon one of the avenues of the city of St. Louis. In other words, spe-

cific negligence was alleged upon which a recovery was sought, and the instruction in order to conform to the uniform rulings of this court should have limited the consideration of the jury to the acts of negligence specifically complained of in the petition. [Wolfe v. Supreme Lodge, 160 Mo. 675; Abbott v. Railroad, 83 Mo. 271; Price v. Railroad, 72 Mo. 419; Feary v. Railroad, 162 Mo. 75; Ely v. Railroad, 77 Mo. 34.]

In Roscoe v. Railroad, 202 Mo. 576, the authorities applicable to this proposition were exhaustively reviewed, and it was there expressly ruled that, if a recovery was sought upon the ground of specific negligence alleged in the petition, it was the duty of the court to limit the consideration of the jury to the specific negligence complained of. However, it may be said that this instruction even in this form, as applicable to this cause, does not constitute reversible error, for the reason that all the proof offered in evidence clearly established that whatever injuries the plaintiff received were by reason of the specific negligence complained of in the petition. We deem it unnecessary to express an opinion upon the proposition that if that error was standing alone in this cause as to whether this court would be warranted in reversing the judgment for that cause.

### III.

This brings us to the consideration of the only remaining proposition in this cause, that is, that the verdict of the jury was excessive. It will suffice to say upon this proposition that we have carefully read in detail all the testimony of all the witnesses, including the medical experts, applicable to the injuries received by the plaintiff by reason of the collision, and we are unable to escape the conclusion that the verdict as returned by the jury was grossly excessive. Whether this excessive verdict was returned by reason of the

error committed by the court in allowing the jury to guess or conjecture as to what should be the compensation allowed the plaintiff for impairment to her earning capacity, there being no proof as to what such earning capacity was, or whether it was occasioned by the dramatic incidents of the trial as disclosed by the record, when the plaintiff was testifying in the cause, would be mere guess work by this court. After a most careful consideration of all the testimony we are unable to conclude that the testimony was sufficient to show that plaintiff's injuries were permanent, and as to what amount of damages she is rightfully entitled to recover by reason of the injuries received in the collision complained of, this court is unable to say, and we are unwilling to make ourselves the triers of the facts without having any of the witnesses before us and also unwilling to guess or conjecture, under the facts of this case, as to what the plaintiff ought to be required to remit in order to have this judgment affirmed.

This is a court of review and we have clearly indicated that the trial of this cause was not in conformity with the well-settled rules repeatedly announced by this court, and that such errors were committed as fully warrants this court in reversing the judgment and remanding the cause for a new trial.

Entertaining the views to which we have herein given expression, it is ordered that the judgment of the trial court be reversed and the cause remanded for a new trial. *Gantt, C. J., Burgess, Valliant* and *Graves, JJ.,* concur; *Lamm, J.,* dissents; *Woodson, J.,* not sitting.