## CHARLES McDONALD, Respondent, v. ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY, Appellant.

St. Louis Court of Appeals, April 2, 1912.

1. CARRIERS OF PASSENGERS: Person Carried Without Paying Fare: Duty of Carrier. Where a person secured permission from the conductor of a railroad freight train to ride in a freight car which was not intended for carrying passengers, by paying him a certain amount as a bribe, the relation of carrier and passenger did not exist, and it devolved upon the railroad company to exercise only ordinary care for such person's safety.

2. MASTER AND SERVANT: Wanton Acts of Servant: Liability of Master. The master is liable for the wrongful acts of his servants, committed within the scope of their authority, even though such acts are wanton and willful and are not directed by the master as to the particular manner of conduct.

3. CARRIERS OF PASSENGERS: Person Carried Without Paying Fare: Assault: Liability of Carrier: Master and Servant. Where a person, who was not a passenger, was riding on a railroad freight train with the consent of the conductor, the railroad company was liable for a wrongful assault upon him by its servants, committed within the scope of their authority in ejecting him; such liability resting upon the law of agency, wholly irrespective of the relation of carrier and passenger.

4. ———: ———: ———: ———: ———: Sufficiency of Evidence. In an action against a railroad company by a person who was not a passenger, but who was riding on a freight train by permission of the conductor, for an assault committed

upon him by the brakemen of the train, evidence *held* to show that at the time the assault was begun such servants were acting within the scope of their authority in ejecting him.

5. **MASTER AND SERVANT: Wanton Acts of Servant: Scope of Authority: Liability of Master.** Where a servant begins a quarrel while acting within the scope of his authority, the master may be required to respond for his subsequent wrongful acts pertaining to the same matter, as the law will not summarily determine when he ceased to act as agent and began to act upon his own responsibility; the determination of that question being for the jury.

6. **CARRIERS OF PASSENGERS: Person Carried Without Paying Fare: Assault: Liability of Carrier.** Where plaintiff was ejected from a railroad freight train upon which he had been riding with the consent of the conductor, and the servants were acting within the scope of their authority in ejecting him, and in so doing they committed an assault upon him and continued to assault him after the ejection was completed, the railroad company was liable for the assaults made after the ejection.

7. ———: ———: ———: ———: **Instructions.** In an action by one assaulted by the servants of a railroad company, who ejected him from one of the company's freight trains, upon which he was being carried by permission of the conductor, but not as a passenger, where plaintiff's evidence tended to show that the assault was begun when he was ejected and was continued after the ejection, and defendant's evidence was that the assault was not made until after the ejection, an instruction that the defendant was liable if its servants assaulted plaintiff at or immediately after he left the train was misleading, in authorizing a recovery even though the assault was not commenced while defendant's servants were acting within the scope of their employment.

8. ———: ———: ———: ———: ———. In an action by one assaulted by the servants of a railroad company, who ejected him from one of the company's freight trains, upon which he was being carried by permission of the conductor, but not as a passenger, where plaintiff's evidence tended to show that the assault was begun when he was ejected and was continued after the ejection, and defendant's evidence was that the assault was not made until after the ejection, an instruction that if the servants of defendant ejected plaintiff from the train, and in doing so, at the time thereof and immediately thereafter, wrongfully assaulted him, he was entitled to recover, was not objectionable; the words, "at the time thereof and immediately thereafter," requiring a finding that the assault was commenced during the process of ejection and while the servants were acting within the scope of their authority.

McDonald v. Railroad.

9. INSTRUCTIONS: Not Based on Evidence. An instruction which submits a hypothesis not supported by the evidence, as a predicate of liability, is erroneous.

10. DAMAGES: Personal Injuries: Loss of Time: Pleading. In an action for personal injuries, an award of damages to the extent plaintiff has been "prevented, by reason of his injuries, from working and earning a livelihood for himself and family" is the legal equivalent of compensation for loss of time; and this is an item of special damages which it is error to allow a recovery for unless it is prayed for in the petition.

11. ——: ——: Instructions: Failure to Limit Recovery. In an action for personal injuries, where the petition prays for the recovery of a certain sum expended for physician's services, an instruction authorizing a recovery for the "reasonable value of necessary medical aid" is improper, for the reason it fails to limit the recovery on this item to the amount demanded therefor in the petition.

12. TORTS: Joint Tortfeasor: Liability. A joint tortfeasor is liable for the joint torts of all.

13. CARRIERS OF PASSENGERS: Person Carried Without Paying Fare: Duty of Conductor to Protect: Assault. Where a person, who was riding on a railroad freight train by permission of the conductor, but not as a passenger, was ejected from the train, it was the duty of the conductor, who was present, to prevent the brakemen of the train from assaulting him after he was ejected, and the railroad company would be liable for the breach of such duty.

14. ——: ——: ——: ——. Where a person who was riding on a railroad freight train by permission of the conductor, but not as a passenger, was ejected from the train, and, after the ejection, was assaulted by the brakemen of the train and others, the railroad company was not liable on the theory it failed to exercise ordinary care to prevent such other persons from assaulting him after he was ejected.

15. ——: ——: Assault: Pleading: Amendment of Petition. In an action against a railroad company, where the petition suggests a breach of the obligation which a carrier owes a passenger, and the proof merely shows that the servants of the railroad company wrongfully assaulted plaintiff, who was not a passenger, the petition should be amended to conform to the proof.

Appeal from Cape Girardeau Court Common Pleas. —*Hon. R. G. Ranney,* Judge.

REVERSED AND REMANDED.

*E. T. Miller, Moses Whybark* and *A. P. Stewart* for appellant; *W. F. Evans* of counsel.

(1) The demurrer to plaintiff's evidence under the second count of the petition should have been sustained. The peremptory instruction at the close of all the evidence under the second count should have been given. (a) Plaintiff was not a passenger on the train. O'Donnell v. Railroad, 197 Mo. 110; 4 Elliott on Railroads, secs. 1580, 1581. (b) The difficulty between plaintiff and the brakeman was personal, and the brakeman was not acting within the scope of his employment, in the line of his duty, and his act did not pertain to the particular duties of his employment. Hartman v. Muehlebach, 64 Mo. App. 565; Collette v. Rebori, 107 Mo. App. 711; Farber v. Railroad, 116 Mo. 81; Raming v. Railroad, 157 Mo. 477; Drolshagen v. Railroad, 186 Mo. 258; Milton v. Railroad, 193 Mo. 46. (c) Plaintiff sustained no injury during the occurrence between himself and the brakeman upon the train. Gilliam v. Railroad, 70 Ala. 268; McGilvray v. Railroad, 41 N. E. 116; McQuerry v. Railroad, 117 Mo. App. 255. (2) The court erred in giving plaintiff's instruction number 1. (a) If the conductor had no authority under defendant's rules to receive passengers on the train, defendant could not be held liable for the violation of such rules, and the fact that plaintiff did not know that the conductor had no such authority was immaterial. O'Donnell v. Railroad, 197 Mo. 110. (b) There was no evidence that the "agents, servants and employees" of defendant "who were in charge of said train" were at the time of plaintiff's injury "engaged in the business of defendant and acting at the time in the scope of their employment." O'Donnell v. Railroad, 197 Mo. 110. (c) There is no evidence to support the call in the instruction that plaintiff was shot while being ejected from the train. An instruction should not call for a finding in respect

of which there is no evidence. Kimble v. Railroad, 108 Mo. App. 78; Heinzle v. Railroad, 182 Mo. 528; Black v. Railroad, 217 Mo. 672. (d) There was no evidence that plaintiff was shot immediately after he left the train. Authorities under c, supra. (e) There is no evidence that plaintiff was injured while being ejected from the train. Authorities under c, supra. (3) The court erred in giving plaintiff's instruction number 2. The same objections are made to that instruction as are lodged against plaintiff's instruction number 1, and are supported by the same authorities. (4) The court erred in giving plaintiff's instruction number 3. The same objections are made to that instruction as are lodged against plaintiff's instruction number 1, and are supported by the same authorities. (5) The court erred in giving plaintiff's instruction number 4. (a) There was no evidence that plaintiff sustained any injuries in being ejected from the train. Kimble v. Railroad, 108 Mo. App. 78; Heinzle v. Railroad, 182 Mo. 528; Black v. Railroad, 217 Mo. 672. (b) The instruction allows recovery against defendant for *all* of plaintiff's injuries. It was impossible for the jury to determine what injuries were caused by the train crew, if any, and what were caused by the citizens at Neely's. Thornberry v. Mining Co., 126 Mo. App. 660; Warner v. Railroad, 178 Mo. 125. (c) The petition does not specify damages for loss of earnings, or any other special damages. Kellog v. Kirksville, 132 Mo. App. 519; Heidbrink v. Railways, 133 Mo. App. 40; Slaughter v. Railroad, 116 Mo. 269; Davidson v. Transit Co., 211 Mo. 320; , Radtke v. Box Co. 229 Mo. 1. (d) The record does not show that plaintiff was a married man or had a family. Such evidence, if admitted, would have constituted reversible error. The instruction should have contained no reference to plaintiff's family. Stephens v. Railroad, 90 Mo. 207; Dayharsh v. Railroad, 103 Mo. 570; Mahaney v. Railroad, 108 Mo. 191; Williams v.

Railroad, 123 Mo. 513. (e) The instruction does not confine the amount to be recovered for medical attention to the amount specified in the petition. Blyston-Spencer v. Railroad, 152 Mo. App. 118; Smoot v. Kansas City, 194 Mo. 513. (6) The court erred in giving plaintiff's instruction number 5. (a) It was not the duty of defendant to detach from its service all of its train crew and constitute them a *posse comitatus* to prevent either the brakeman, Allison, or the citizens of Neely from inflicting injury upon plaintiff. (b) The instruction is further erroneous in permitting the jury to find that the acts by which plaintiff was actually injured were committed by servants and employees of defendant while acting within the scope of their employment. (7) The court erred in giving plaintiff's instruction number 6. (a) The instruction states that the conductor and brakeman were acting in the line and scope of their employment in ejecting plaintiff from the train and in inflicting injuries on plaintiff. It assumes as true, and so states to the jury, controverted facts. Crow v. Railroad, 212 Mo. 589. (b) There was no evidence that the conductor had anything at all to do with any injury plaintiff sustained. (8) The court erred in giving plaintiff's instruction number 9. (a) An instruction on the measure of damages should be prefaced by a statement that "if the jury find for plaintiff, etc." Such statement is absent from this instruction. Morrell v. Lawrence, 203 Mo. 363. (b) There is no evidence in the record that plaintiff was a married man or had a family. Stephens v. Railroad, 90 Mo. 207; Dayharsh v. Railroad, 103 Mo. 570; Mahaney v. Railroad, 108 Mo. 191; Williams v. Railroad, 123 Mo. 573. (c) The petition does not seek loss of earnings or other special damages. Kellogg v. Kirksville, 132 Mo. App. 519; Heidbrink v. Railways, 133 Mo. App. 40; Slaughter v. Railroad, 116 Mo. 269; Davidson v. Transit Co., 211 Mo. 320; Radtke v. Box Co., 229 Mo. 1. (9) Plaintiff's

instructions 1, 2 and 3 are in direct conflict with defendant's instructions 8 and 9. The jury could not follow both sets of instructions. Defendant's instructions correctly stated the law. Wallack v. Transit Co., 123 Mo. App. 160; Smith v. Railroad, 126 Mo. App. 120.

*Lane & Alexander* for respondent.

(1) The demurrer to plaintiff's evidence was properly overruled, also the peremptory instruction at the close of all the evidence was properly refused. Whether or not the servants of the railroad company were acting within the scope of their employment and in line of their duty, when the assault upon plaintiff was made, was a question of fact to be submitted to the jury, upon proper instructions of the court. Knowles v. Bullene & Co., 71 Mo. App. 348; Tierney v. Railroad, 32 N. Y. S. 627; Cable Co. v. Brantley, 18 So. 321; Railroad v. Bowlin, 32 S. W. 918; Magar v. Hammond, 3 L. R. A. (N. S.) 1041; Craven v. Bloomingdale, 171 N. Y. 439; Daniel v. Railroad, 4 L. R. A. (N. S.) 497; 1 Thompson on Neg. (1901 Ed.), sec. 427; 3 Thompson on Neg. (1901 Ed.), sec. 3257; 3 Thompson on Neg. (1901 Ed.), sec. 3308; Flynn v. Transit Co., 113 Mo. App. 194; Krueger v. Railroad, 94 Mo. App. 463; Railroad v. Matthews, 13 Ind. App. 355; Williams v. Railroad, 73 S. W. 780. (2) Defendant's servants were acting within the scope of their authority and in the line of their duty, in ejecting plaintiff off of the train, and if their conduct in the discharge of that duty was malicious, wanton, brutal and reckless, these facts do not relieve the company from liability for the acts of its servants, committed in the course of their employment. Haehl v. Railroad, 119 Mo. 330; Knowles v. Bullene & Co., 71 Mo. App. 346; Snyder v. Railroad, 60 Mo. 413; Canfield v. Railroad, 59 Mo. App. 354;

Ephland v. Railroad, 137 Mo. 187; Clack v. Supply Co., 72 Mo. App. 506; Todd v. Havlin, 72 Mo. App. 565; Ruth v. Transit Co., 98 Mo. App. 1; Payne v. Railroad, 105 Mo. App. 155; Meade v. Railroad, 68 Mo. App. 92; Fishing Club v. Stewart, 93 S. W. 598; Eckert v. Transfer Co., 2 Mo. App. 45; Williams v. Railway, 73 S. W. 780; Railroad v. Seals, 100 Ala. 368; Curtis v. Railroad, 99 Mo. App. 506; Voegeli v. Marble & Granite Co., 49 Mo. App. 643; Garretzen v. Duenckel, 50 Mo. 107; Flynn v. Transit Co., 113 Mo. App. 194; O'Brien v. Transit Co., 185 Mo. 263; O'Brien v. Transit Co., 212 Mo. 59; Eades v. Railroad, 43 Mo. App. 545; McNamara v. Transit Co., 182 Mo. 676.  (3) Even though a person is known to be a trespasser on a given train, if he is permitted to enter the train, with the consent of the conductor, or other person, in charge thereof, although he was riding in violation of the company's rules, the company owes him the duty of ordinary care, and for failure to furnish such ordinary care, in cases of his injury will be held liable for damages. Whitehead v. Railroad, 99 Mo. 263; Hahel v. Railroad, supra.  (4)  And although a person riding unlawfully on a freight car, is a trespasser, the employees of the railroad company have no right to inflict wanton or willful injuries upon him.  Farber v. Railroad, 116 Mo. 181; Planz v. Railroad, 157 Mass. 377; Railroad v. Gantz, 38 Kan. 608; Feeback v. Railroad, 167 Mo. 206; Farber v. Railroad, 139 Mo. 272; Brill v. Eddy, 115 Mo. 596.  (5)  Both plaintiff and defendant proved that it was the duty of the conductor and brakeman to eject trespassers from the train, and it is not error for an instruction to assume the existence of a fact which is not controverted by any testimony, and which the parties, as they did in this case, by the manner of examining the witnesses and otherwise throughout the trial assumed to exist.  Davidson v. Transit Co., 211 Mo. 357; Taylor v. Iron Co., 133 Mo. 349; Gayle v. Car & Foundry Co., 117 Mo. 427;

Fullerton v. Fordyce, 121 Mo. 13; Stotebier v. Railroad, 203 Mo. 702. (6) Plaintiff's instruction No. 4, on the measure of damages properly declares the law in this case, and similar instructions in cases of this character have many times been approved by the appellate courts of this state. Tandy v. Transit Co., 178 Mo. 243; Lindsay v. Kansas City, 195 Mo. 166; Reynolds v. Transit Co., 189 Mo. 408; Rodney v. Railroad, 127 Mo. 676; Whalen v. Railroad, 60 Mo. 325. (7) Proof of the earning capacity of the plaintiff in this case was made fully, without objection on the part of the defendant, and defendant also cross-examined the plaintiff on that point in this case, and defendant should not be heard to complain on that proposition. The impairment of the earning capacity is an element of the damage flowing from the nature of the permanent injury. 6 Thompson on Negligence (1901 Ed.), sec. 7294 and note 1; Dunn v. Railroad, 81 Mo. App. 44; Rosenkrantz v. Railroad, 108 Mo. 15; 1 White on Personal Injuries, sec. 184, and cases cited; 3 Sutherland (3 Ed.), sec. 942, 945. (8) The fact that the injury complained of, more or less incapacitated the plaintiff for the performance of labor or the pursuance of his ordinary avocation, is a proper element to be considered by the jury in estimating the amount of damages to which plaintiff may be entitled to recover by reason of his injuries. Batten v. Transit Co., 102 Mo. App. 292; Robinson v. Railroad, 103 Mo. App. 113. (9) It was defendant's duty to use ordinary care even though plaintiff was a trespasser, and if defendant by the use of ordinary care, which included its agents and servants in this case, could have prevented plaintiff's injury, and while they were acting in the scope of their employment, as pointed out in the other instructions in the case, and the plaintiff was damaged by reason thereof, that the defendant would be liable. This certainly is the law in this state, and the law in this case under the facts. Barker v. Rail-

road, 98 Mo. 50; Rine v. Railroad, 88 Mo. 392; Reardon v. Railroad, 114 Mo. 384.

STATEMENT.—This is a suit for damages accrued to plaintiff on account of personal injuries received, through the willful and wanton conduct of defendant's servants in ejecting him from its train, and immediately thereafter. Plaintiff recovered in the amount of $6010 and defendant prosecutes the appeal.

Plaintiff is a colored man, and that he was subjected to an outrageous assault at the hands of defendant's brakeman all of the evidence tends to prove; but though such be true, much of the evidence for him and all of that for defendant, tends to prove as well that the real injuries were not inflicted upon him until after he had left the train and repaired to a near-by residence. However this may be, plaintiff is entitled to the full benefit of his version of the matter, and we, therefore, set forth his testimony in full. In his own behalf, plaintiff testified as follows: ''Have lived in Cape Girardeau about seven years. During that time have worked at various kinds of common labor. Worked for Mr. Hely and made twenty cents an hour; two dollars or three dollars a day at that. Worked for Mr. Matteson at one dollar and seventy-five cents; on the streets at two dollars a day; don't make anything now. On March 8, 1910, I was at the passenger station in Cape Girardeau, Missouri, when the passenger train came in. It stood there awhile and left and then the local came and the conductor stepped off of the caboose of the local and went into the depot. I walked to the door before he came out and stood there waiting for him; he had two little yellow pieces of paper in his hand, and I said, 'Say Boss, I want to go to Crystal City with you, I have got a little money and didn't have enough to pay my way on the passenger train, and I thought I would pay you on the local.' He asked me what I was going up there for and I said,

'I am going up there to work, I have a little money.'
He says, 'How much have you got,' and I said, 'I have
seventy-five cents, I will give you whatever you say to
let me go,' and he said, 'All right, hand me a quarter,
get right in that car next to the caboose and I will see
that you get out at Crystal City,' so I went around and
got my bundle and got into the train and commenced
talking to the boys and told them I was going to Crys-
tal City, and after awhile the train pulled out and I
was well satisfied and sat down a while. Both doors
of the car I got in were wide open from one side to the
other, only the back window next to the caboose had a
little strip nailed over it. When they got to Bain-
bridge all was all right with me, and it seemed like
they were putting out a hot box, and they passed by
me and I was right there in the door looking at them,
and the man who took the number of the cars came
around and I said 'good evening' and he said 'good
evening,' and after awhile they got through, and this
little brakie Allison came by and waved his hand at me
and I waved too, and Allison got in the train, and the
train pulled out. When we got about half way be-
tween Bainbridge and Neely's Landing, Allison came
to the back window next to the caboose and knocked
and said, 'Open up this window,' and I said, 'All
right, sir,' and went there to open it up and I saw
where it was nailed and said, 'This window is nailed,'
and he said 'Pull it loose,' and I said, 'All right,' and
pulled it loose and he climbed on some steps and tried
to get in, and said, 'You want to catch hold of here.'
I knew I had paid my way and thought he just wanted
to get in and talk with me, and I got hold of his hand
and helped him in. I asked the other fellow, 'Do you
want to come in,' and he shook his head and said, 'No,
I don't want to come in,' and he looked at me and I
commenced talking to him, and he said, 'Have you got
any money,' and I said, 'No, sir.' I got kind of scared
then and was facing the one at the window, and the

other one pushed me in the neck with his pistol, and I looked back and jumped and said, 'I ain't done nothing,' thought he was going to kill me right away. He says 'I know you aint, throw your ———— hands up.' I threw them up and he searched me with one hand and held the pistol right there.· He could not find anything. I had a half dollar in my pants pocket but he searched me all over and didn't find it. He says, 'This black ———— ain't got nothing, I am going to make him jump out of this car.' I says, 'I ain't done nothing, I have paid that man to go; I paid that conductor to go, what do you want to make me jump out for.' The door of the caboose was open and I said, 'Holler in and ask him if I didn't pay him,' he said, 'I ain't going to ask him nothing, you ————; you didn't pay me. You think I won't make you jump out,' and he shot down twice right at my leg, and I jumped back. I had my hands up and he said, 'Poke them up, you ————, I am going to shoot you right out of the car.' I says, 'I ain't done nothing,' just as he ·went to throw the gun down. I was right at the door and the train was running. He threw the gun down to shoot me and I threw my hand on it and snatched it up and it shot over his head when I took the gun. He says, 'Please don't kill me,' and I said, 'I don't want to kill you; get out. of the car.' The other brakeman and conductor and all of them were standing there and looking right at me. I says, 'Get on out, I am not going to kill you,' and he backed up to the window and said 'You will kill me if I turn around,' and I said, 'No' and put the pistol in my overcoat pocket, and he turned around and got out and said, 'Now you got to give me my gun,' and I said 'No, I won't give you this gun' and he said, 'You will give it to me, you ————,' and I went to the door next to the river as quick as I could and looked back and that fellow had a gun just this way ready to shoot, then I went to the other door and the brakie on that side was holding a gun, and by that time the train

McDonald v. Railroad.

commenced to slow up at the station, and both men jumped off on each side and then the conductor that I paid came to the car where I was and called to me and said, 'Come here, you old ———, here is your ——— quarter; light, drop out,' and I said, 'I thought I paid you to Crystal City,' and I dropped out, and as I stepped down this fellow gave me a punch and hit me right back of the neck, and I went over to Mr. Fulbright's wife who was standing in the door, and said, 'Will you telephone to the Cape for me, please ma'am,' and just as I said that Allison fired at me twice, and shot me twice all up and down my back, and I fell, and when these men shot this woman yelled and went back in the house and shut the door. I fell sloping and went right back behind that house, and up side that big bluff, and they were shooting at me and crying, 'Don't let him get away; kill him, kill him,' and I ran to the big bluff and got stuck and couldn't get any further, and the brakeman that had the shotgun shot me again in the shoulder, and I fell and turned and came right back to him, and they commenced shooting at me and I ran by them, and this brakeman cut down at my legs and missed me and I ran around to the door of this woman's house and said, 'Please, ma'am, don't let him kill me.' I looked to see if I could get under the house, but couldn't. They rushed around on me and this fellow throwed up his gun to kill me and said, 'What are you doing, ——— your old soul,' I says, 'Don't kill me, I am just trying to save myself.' The conductor that paid me had a shotgun, and the brakeman Allison had a single barrel shotgun, and the tall brakie that was at the door had a Winchester, and one or two of the citizens up there, and they had me there with my hands right behind the door, and this woman was standing at the door hollering, 'Don't let him in here, don't let him in,' and I was standing there begging, 'Please don't kill me,' and they were knocking and hitting me all across the head. The two

citizens held me and one of the brakies, Allison, got
a big stick and commenced beating me right in the
back, and the other were punching me in the back with
a gun, and they yelled, 'Kill him on his feet; kill him
right here,' and Mr. Fulbright said, 'Don't kill him
right besides my house, take him out from my house,'
and they took me out from the house a short distance
and held me, juggling me back and forth, and the two
brakies were hauling off and hitting me, and Allison
was kicking me some, so hard I fell down. They
marched me around the house and someone yelled,
'Lynch him, don't let him say a word,' and I said 'O
Lord have mercy' and Allison said, '———— you, ought
to have called on him when you came up here; Lord
can't do you any good now, we have got you. Taking
my gun, you ————.' I had my hands up and he
whaled me across the head again. The brakeman and
the heavy-set fellow I paid had me, too, all of them but
the engineer and fireman. They were marching me
around in front of the engine and they stood me there
about five minutes and beat me awhile, and Allison,
the brakeman, said '————, don't kill him here, take
him to the railroad; ———— I feel like shooting him,'
and someone said, 'Hold Allison, don't let Allison
shoot.' He was crying, 'Let me get him.' He com-
menced shooting, had his shotgun and they pushed
me a ways and this time they let him. I was doing my
best, shot up and couldn't see much, but I was ducking
and running just as hard as I could with both hands up
trying to get back down the railroad to Cape, and I
got down the railroad about half a mile near a tool
house and two cars standing on the railroad, and they
commenced shooting at me with Winchesters and I
was running just as hard as I could, and aimed to get
around behind the cars, and just then some fellow
made two quick shots, don't know who it was. They
were standing back by the depot and I was half a mile
down the railroad, and one shot hit my leg and broke

McDonald v. Railroad.

it, and the world and the cars and river looked like
they were going around, and when I fell this leg came
down and I fell back into the river and I laid there
awhile and came to and my leg was lying sort of that
way, and I pulled it back and saw I was sitting right
on the edge of the river, and I heard sounds of shoot-
ing right over my head. I was sitting with my back
to the north and holding my leg. They shot at me
about forty times right there and then stopped, and I
saw a board and reached and got it and got up on my
hands and put my arm on this board and commenced
trying to hop, hopped a short ways and staggered
back and sat down. Could hear them coming holler-
ing, 'Kill him as soon as you get him, kill him, kill
him,' and I commenced to let down on that leg to get
to the curve, trying to save myself, and before I got
to it little Allison came behind me with his pistol in
his hand and I let down on that broken leg and tried
to hop, and he shot and hit me right on the bottom of
the foot and deadened the whole leg, and I fell back
into the river and laid there a good time, and Allison
was running back on the railroad and said, 'I told you
I'd kill the ———.' I saw him when he was coming
behind me, looked back, and he commenced shooting
me as fast as he could, and one ball hit me in the bot-
tom of the foot. Someone hollered, 'He ain't dead yet,
finish killing him,' and the fellow threw up his gun to
finish killing me and I said, 'Boys, please don't kill me,'
and someone, don't know who it was, a citizen I reckon,
says, 'Wait a minute, let's let him talk awhile,' and
he asked me where I was from and I told him from
the Cape and was going to Crystal City and had paid
that conductor, and he had got me up here and was
trying to kill me, and he said, 'I don't believe I will
let them kill you,' and waved his hand to another fel-
low and said, 'Come down here and let this nigger
talk.' They questioned me and I told them I was
from the Cape, and had been there for several years,

and he said, 'I don't believe I will let them kill you,' and the brakie says, 'What the hell are you waiting on there, ———, we have got to leave, we haven't time to talk with that ———; pitch him in the river and go home,' and this fellow says, 'What is the use of killing a ——— nigger for nothing? This nigger paid you to carry him to Crystal City, why don't you carry him on?' This brakeman yelled back and says, 'You helped shoot him, why in the hell don't you finish killing the ———,' and he said, 'You didn't tell us, you said he had come from away down the road and had committed a crime,' and he said, '———, we will kill you and him both, you ain't no better man than that ——— nigger.' Then this fellow hollered back, 'I am going to carry him to the station and send him home,' and he raised me up and I could not stand it, and he tore the lining out of my coat and tore off the shoe and told the fellow to go to Seagraves to send the car down. By that time the train blew and they put me on the car and carried me to the station, and I stayed there until the train came and they put me on and sent me home. ·I was in bed five months as the result of my wounds—six months I got up and was trying to sit around in a chair. I was shot in the back and through the right leg, and all in the back of the head, and on my side and all over, and bruised up insides, and cast up blood all the time. From the time I was shot up to now I have suffered great pain of body and will suffer pain from those wounds; just naturally feel bad yet. My leg still hurts every time I make a step. Where the ball was taken out of my left leg it is dead; it is paining right now and has never come back to itself. I was shot in the left foot and it is swelled up yet. The doctor performed an operation and took the ball out. I suffer from the wounds in my back; can't pick up anything; give out in the back. Can't do manual labor like I did. Have been trying to work for myself but can't do anything at all. The

leg that was shot in two is crooked now; gives out on me every time I step. It was not crooked that way before I was shot. Am thirty-one years old and was a stout, healthy, strong man prior to this injury, and always able to perform hard manual labor. Dr. Dalton attended me and dressed those wounds and gave me medicine. Don't know the name of the conductor that had charge of this freight train on which I rode. Carle was one of the brakemen, and the little fellow was Allison; he was the one I helped into the car and the one that shot at me in the car. Don't know the man I gave the money to, he was a heavy-set fellow. When I got out of the car I started to run over to a house which was about fifty yards from where they stopped. They stopped right at the door and put me off on the platform, and the man I gave the money to gave me a quarter and told me to light, and stepped into the depot. Immediately after I got off the brakies hollered, 'There he is, don't let him get away; shoot him, kill him,' and they were shooting at me just like they were shooting birds, and I was running, too. After I got away from the door around behind the house and these parties came up, Allison and the other brakeman came up, too, and Allison had a club and beat me and knocked and kicked me all he could. Blood was coming out of my eyes and nose, and I thought they would kill me there on foot. They were hunching me on the back and side. After they caught me I could not run, and did not get away. When they were shooting at me I started up the bank and I got as far as I could, and this man shot me in the side and I whirled and meant to come back and I fell, and I came back to the ground with my hands up, and when I fell the pistol that I took from the brakeman came out of my overcoat pocket. I went back there as hard as I could, and when they got me around the house and was beating and knocking me, then Allison thought about that pistol and he searched me and said, 'The ——— threw

my pistol away, take him back and make him find it,' and they marched me up to where I made the turn and I looked down and said, 'There is the pistol where I fell down,' and Allison grabbed it up and threw it down to kill me, and a citizen up there knocked the pistol up and said, 'Don't kill him,' and it went off over my head. They carried me to the railroad then and stood and beat me awhile and knocked me across the head. I have agreed to pay Dr. Dalton whatever his services for medical attention were reasonably worth.''

### CROSS-EXAMINATION.

''Have not paid my medical bill, just told the doctor I would pay it whenever I got able to pay it. Don't think I would know the conductor if I should see him again, but I would know his build. Had never seen him before and have never seen him since that day. (L. A. Gibson was here produced and exhibited to the witness.) That is the man I paid the money to down here at the station to carry me to Crystal City, and the one who told me to get off the train. I did not try to get on the passenger train that day. It was no use for me to try because I only had a dollar; I did not have money enough. Had been to Crystal City before, but never worked there. Had gone from Cape Girardeau to Crystal City about a year before; went on a passenger train on the Frisco railroad. Don't know what the fare cost me then, but I bought a ticket at that time. This time I did not try to get on the passenger because I did not have money enough to go up there. The first time I went from here to Crystal City over the Frisco railroad I bought a round trip ticket and paid more than a quarter for it, but don't know just what I paid. That day the local came along about half an hour after the passenger had gone north, and this man I paid the money to got off the train and

went into the office in the station. I first saw him as he stepped off the train. The train stopped and he swung off and went in and went into the office inside the station, and I went in and stood at the door to the office and waited for him to come out, and when he came out I asked him if I could go to Crystal City and told him I had a little money, not much but enough to pay him to go. He asked me how much I had and I told him seventy-five cents, and I wanted to go to Crystal City to work, and I asked him if he could carry me, and he said, 'Yes, I will carry you for a quarter; where is your quarter?' and I said 'I have got it here,' and handed it to him, and he said, 'I will see you safely to Crystal City, you need not be uneasy,' I did not count the cars in that train, but it was a short freight train and there was a caboose on it. I started to get in the caboose and he told me to get in the car, and I went over and got my bundle and came back and got in on the west side of the car. There was nothing in the car. It was a box car and both side doors were open and it was the car next to the caboose. There was a door in the end of the caboose next to the car I was in and that door was open. There was no ladder on the back end of the car I was in. There was a window in the end of the car next to the caboose; it was nailed up. It was about six feet from the floor, but I could see out of it. When I helped this fellow in the car, and all the noise commenced and they were talking to me and cursing me and the two shots were fired, the conductor came to the window and looked at me in the car and I saw him then; he came right to the car door and the rest of the train crew were standing there looking at it. Have lived in Cape Girardeau three years. Worked on the Smith farm in New Madrid county for a while, and then came to Cape Girardeau. Worked for Mr. Matteson here two years at one dollar and seventy-five cents a day, then worked for Mr. Morrison and then for the Union Lumber

Company for one dollar and fifty cents a day. Loaded cars for Mr. Hely and got twenty cents an hour. I had no job when I started to Crystal City. I started to go to Crystal City, March 8, 1910. The train was about half way between Bainbridge and Neely's when Allison first tried to get in the car. Nothing had bothered me before that. He came to the window and hollered and said, 'Open this window,' and I hold him it was nailed, and he said to jerk it loose and open it, and I pushed it open and he commenced to climb in and I gave him a hand and pulled him on in. I asked the other fellow if he didn't want to get in and he shook his head, 'No.' He was standing with one foot on the caboose and the other on the drawhead and had his head up in the window looking in. The door of the caboose at the end of the car was open. Allison and I were alone in the car. He had not said anything to me. The first thing he did was to punch me in the neck and I looked around and dodged back. Before that the man in the window asked me if I had any money and I told him I didn't then Allison touched me and said, 'Throw up your hands;' I put them up and he said, 'Shove them up further,' and commenced to search me. I kept my hands up and he went all through me; all but my hind pocket. After he got through searching me he looked at the other fellow and said, 'This —— ain't got nothing; I will dump him out of the car,' Allison had the pistol in his hand then. He said, 'Back out,' I said, 'I ain't done nothing.' When he made the shot this fellow came to the door of the caboose. There were two of them standing in the door of the caboose looking in the window. The train was moving then. Allison backed me up to the door and started to shoot me and as he started to pull the trigger I snatched the gun and it went off over his head. Two shots were fired at my body down here before that when they were backing me up. Allison told me to hold up my hands, that he wanted to

search me and get my money. I told him I didn't have anything and he said he would search me and see. He was facing me when he fired the first shot, but I did not have hold of him. He was on the side next to the river and backed me up next to the door on the west side. While I was backing up he shot at me twice. I could not tell which way the shots were going; I was looking at him and begged him not to kill me. The third shot was when he came up to me and I was right next to the door, and then I took the pistol from him. When I snatched the pistol the other man looking in the window left. Allison was then begging me not to kill him and I said, 'I am not going to kill you.' When the third shot was fired the other man went back in the caboose and shut the door. It was not long from the time that Allison came in the car to the time he told me to throw up my hands. I was looking at the other fellow in the window and Allison had the gun punching me in my neck. It was about five minutes from the time Allison began to shoot until he got out of the car. He backed to the same hole he came in, but would not get out until I dropped my gun in my pocket. When I dropped my gun in my pocket he got out; he went in the caboose. When he got out of the car I ran to the door on the side next to the river and looked out toward the caboose and the other brakeman that had had his head in the car had a gun ready to shoot. Don't know what kind of a gun, I just got a glimpse of it and took my head in. Then I ran back to the door on the other side and saw Allison with a gun; he was standing on the steps of the caboose. They did not say anything to me while they were standing out there on the steps. The train blew for Neely's station while they were standing out there on the steps, and when it slacked up to stop the first man that jumped off was the man I paid. The train was then right at the station and he stepped off on the platform. The car I was in was then opposite the door of the

depot. The conductor got off the front end of the caboose on the west side and came up there and told me to drop out; to light. I was standing in the door and said, 'I thought that you were going to carry me to Crystal City,' He says, 'No matter about that, you fall out.' This was the same man I paid the money to at the Cape. I got out and when I *first lighted a lick hit me* in the back of the head; I was right at the car door in front of the station door, but don't know what brakeman it was. He hit me in the back of the head with the gun he had and gave me a punch, and I didn't look around but went straight to that woman's house. That is all that was done there; no shot fired then. I started over to Fulbright's house, the depot agent's house, which was about fifty yards from the car, right at the foot of the hill. I had to cross a road to get there. While I was on the way over there two shots took place and I hit the ground. I was running and had gone about fifty yards from the car before the shot was fired. The shot took me in the back; it was from a shotgun fired by little Allison, who was standing on the steps of the caboose. The other brakeman was in front of the car door next to the river looking through the car I got out of with his gun in his hand. The shot were little bits of shot, but they knocked me down, I hit the ground. There were two shots fired by Allison. I was then right in front of Fulbright's house. I then got up and went around the corner of the house toward the north, and as I went around the corner two more shots were fired from a shotgun, but I don't know who fired them. Every time a shotgun was fired I felt it. I did not go around the house then, didn't have time, but just kept pulling until I got to that hill. Thought I could get up the hill and get away. I started to go around the house, but when the two shots were fired I forgot which way I was going and started for the hill and I made a turn and was shot in the side and fell down.

I was going toward a little thicket of woods. They were shooting at me all the time with shotguns, Winchesters and pistols. From the time I left the depot up to that time there were about two hundred shots fired at me, I reckon. There was nobody near me when I got to the house, but they were down at the station shooting at me. I got about forty feet from the house but could not crawl up the bluff. They were shooting at me from the station and one fellow shot at me with a shotgun and hit me in the side and I whirled and went back to the crowd. They were then coming up on me and hollering, 'Kill him.' Think there were about thirteen in the crowd and all had guns; shooting all the time and hollering, 'Don't let him get away.' Some of them were trainmen and some were not. I did not have time to look at what trainmen were in the crowd. At that time they were up by the station agent's house and were all hollering, 'Kill him, don't let him get away.' Everybody was saying that. Every man I saw but two had guns. They caught me at the back side of the house, at the kitchen door where I had run when they came up with me. I went to the door and knocked and said, 'Lady, please let me in, don't let them kill me,' and she held the door and hollered, 'Here he is, don't let him get in.' When the crowd got there they rushed around as quick as they could and threw the gun up to shoot and I threw my hands up and says, 'I am just trying to save myself,' and the little brakeman Allison ran up to me and threw up his gun to kill me, and one of the fellows knocked it up and it went off. After they stopped him two of the brakies made two shots at me. No other kind of shot except the shotgun shot hit me up by the house, but some rifle shots hit my overcoat. They took me out from the house and one brakeman got on one side and one on the other, and the little brakeman got behind me

with a stick and they told me to poke my head up.
All the other people were holding the guns on me.
They took me out from the house and stood me there
two or three minutes and held my hands up, and the
brakeman beat me while the other fellows had their
guns on me, pistols, shotguns and Winchesters. The
brakeman said, 'Lynch him; don't let him say a word.'
Then they carried me to the railroad and stood me
there about a minute and commenced shoving me
down the railroad on the north side of the station.
The engine was just past the station at the north end
of the platform and that is where they took me. They
beat me and kicked me and knocked me across the
head; that was the same crowd that had me on the
hill. They did not shoot me while I was standing
there. I had been shot with a shotgun when I was
running up towards the house, but was not shot at
the station when they brought me back. Then two of
them commenced pushing me down the railroad south
toward the Cape; the others were standing still wait-
ing until they got me far enough to shoot. I knew
the brakemen that were hollering to shoot, but didn't
know anybody else in that crowd; there were about
thirteen in the crowd. Two of the brakemen were
pushing me down the railroad. One of the citizens
was holding Allison who was trying to get away to kill
me on the spot. The other citizens were hollering,
'Don't let him kill him yet; carry him out of the way,'
and Allison was crying and hollering to get loose.
They pushed me down the railroad about forty feet
and then they turned me loose and commenced to
fire at me with pistols and the little brakeman Alli-
son hollered to them, 'Look out of the way, let me
get the ———,' and the other fellows that were stand-
ing there hollered, 'Run, run, run,' and  this fellow
hauled off and shot at me twice. Don't know how many
shots were fired after they let me loose; close on to
fifty, I reckon. The two brakies that had me were

cracking as fast as they could, and Allison after they turned him loose, shot me twice with shotgun, and the other brakeman that had the Winshester commenced to cut down on me. Don't know whether anybody else fired at me, didn't have time to look back. I was running but no Winchester shots or pistol shots had hit me yet, but they were cutting my coat all to pieces. I was running down the railroad toward the Cape and had run a quarter or a half a mile before I was shot. Then I was shot in the right leg about four inches below the knee. I couldn't run any more. I was then about even with the cars on the switch and I went around the car and staggered and fell and laid there a while with my hand in the river. The first shot that hit me was the first rifle shot fired, and I was then about *half* a mile from the station. I laid there about five minutes before somebody came down there. There were about five of them came down there. There was Carle, one of the brakemen, and Allison and the other brakeman, I don't know him, but he had a gun, and the conductor that took the quarter from me came down, and Mr. Seagraves. I was down on the river bank and when they came down there I got up on one leg. The other leg was broken at that time by the shot. I got up and commenced hopping along and Allison came right in behind me with his pistol and commenced shooting at me, and he hit me right in the bottom of the foot; don't know whether it broke any bones, but it was awful hurting. There were six shots fired at me down there, but only one hit me, a pistol shot; that was in my foot. There was no shotgun shots made then. Allison ran up on the railroad and said to the rest, 'I told you I would kill the ————.' I was then lying down on the bank, and when I turned my head one of the brakies said, 'He ain't dead yet; kill him,' and Allison turned around and says, 'He ain't dead yet; kill the ————,' and he threw up his gun to kill me, and the other strange fellow that came

along said, 'Wait a minute, let us let him talk.' Allison was then standing about thirty feet from me on the railroad ready to shoot. The other man, I don't know who he was, came down where I was and commenced to question me and I told him where I was from and my business. Allison hollered and asked them what they were waiting on, and said, 'Look out the way, and let me finish killing that nigger, and put him in the river; we have got to leave.' They had been standing around there two or three minutes and this fellow hollered back and said, 'Go on and leave; I am not going to let you kill him.' Then they turned around and walked up the railroad toward the station. They had to go a quarter or half a mile and they got on the train and the train left. The man that talked to me told a little boy to go up and tell a man to fetch the hand car, and two men fetched it back and they got me up to the car and carried me to the station and put me in there. This was about 5 o'clock in the afternoon, and I stayed at the station until the 10 o'clock passenger came and was then brought down to the Cape, and Dr. Dalton treated me after I got here; he is the only one. That was my first time at Neely's Landing, but I had passed through there once or twice; once going to St. Louis and once going to Crystal City. Had traveled up and down the railroad to St. Louis two or three times before that trip on passenger trains.''

## RE-DIRECT EXAMINATION.

"Q. Have you got the clothing; that is, the coat and shoes that you wore that day you were shot up at Neely's Landing? A. Yes.

Q. Now I will ask you if this is the shoe you wore the day you were shot (exhibits shoe to witness)? A. Yes, sir.

That is the sock I had on, and the hole in the bottom of the foot is the bullet hole where Allison shot me. I was shot in the under part of the foot while I was hopping.

Q. Now this (exhibiting coat to witness)? A That is the overcoat I had on.

The place it is torn is where they tore it out to wrap my leg in. These little holes in the lining of the coat are shot holes. I had that coat on. That day was the first time I had ever seen any of these railroad men. I never knew Gibson or Allison or Carle, or any of them that were in charge of the train that day. Did not know any of them before the shooting. Mr. Gibson looks like the man that I gave the money to. I paid this money to one of the railroad men that carried the orders from the depot to the engine. Saw him carry papers and give them to the engineer and hailed him right there. He got that paper in the telegraph office at the station and I asked him just as he came out. As the train pulled out I stood right in the door of the car; both side doors were open. I saw the trainmen at Bainbridge and among them was the man that I gave the money to; they saw me and spoke to me and didn't say anything about my getting off the train then. We were about half way between Bainbridge and Neely's when the brakeman Allison came to the window. When I stated that there were 200 shots fired up there at Neely's Landing that is simply my estimate.

Q. You said yesterday afternoon that some man prevented Allison from shooting you after he had run you over there across the road; did you ever learn who that was? A. No, sir; I never did learn who he was.

Q. You did not know any of the people up there, the citizens? Mr. Whybark: Object to any evidence as to what took place down below town at the time of that shooting because it is clearly outside of the transaction.

Mr. Alexander: I am asking when they first commenced, across the road, when they had run him off the platform.

Mr. Whybark: Object to that because he had left the train, and was no longer on the depot grounds.

The objection was overruled and defendant excepted.

A. No, sir. When I got off the train on the platform I noticed two or three other people there besides the railroad men. It looked to me like they had guns, but I did not know them and don't know whether they were railroad men or not."

## RECROSS-EXAMINATION.

"The bullet went into the shoe and came out into my foot. Did not go through the foot but stopped up here, think it shattered one bone, the doctor said. That shot was fired when I was down under the river bank after I had been shot in the leg. That is the last shot that was fired and it hit me in my left foot. The right leg was broke. I had this coat on when I was running. The fellow that helped me tore part of the lining out to wrap my leg; outside of that the lining was good. The hole in the shoulder was where a shot or something touched me, but didn't make any wound; think that shot was fired when I was going up behind that house. I think that is a bullet hole in

that coat, and was made when I was going toward them and they were shooting at me with a pistol. All the shot wounds I had were little shots except the one in my leg and foot. Don't think I have any scars where the little shot hit me on my head, but I have on my body, but this was small shot. The coat has several snags; think it was torn before, am sure it had no hole in it besides those before that. The train stopped at the station at Bainbridge about five minutes, and the trainmen came out of the caboose and walked up. Did not hear them say there was a hot box, but I looked at them up there and it seemed like they were putting something out. I did not get off the train, but just looked out of the door on the side next to the river. Nobody said anything to me up to that time. I saw the man that I paid the quarter to. The man I identified yesterday looks like the same man to me."

NORTONI, J. (after stating the facts).—All the evidence tends to prove, and indeed it is conceded throughout the case, that the train on which plaintiff took passage was an extra on which the carriage of passengers was prohibited. From plaintiff's evidence alone it appears that the relation of passenger and carrier did not subsist between him and defendant. Plaintiff says that, being without sufficient means to pay the regular passenger fare, he entered into an arrangement with the conductor of the freight whereby he was to be carried from Cape Girardeau to Crystal City on the payment of twenty-five cents. But this arrangement involved his carriage in a freight car. While it does not appear conclusively plaintiff knew the carriage of passengers was prohibited on this particular train, it is obvious that he did not become a passenger by merely paying a bribe of twenty-five cents to the conductor and accepting passage in the freight car in no sense designed for pas-

senger service. At most, plaintiff·was not a trespasser, but, instead, occupied that relation which attends one upon the train, who does not know that he is violating the rules of the carrier, and relies upon the consent of the conductor. This being true, the duty of extraordinary care and other incidents to the relation of passenger and carrier does not obtain in the case, ·but, instead, it devolved upon defendant only to exercise ordinary care for plaintiff's safety while in transit and during his ejection or until he had safely alighted from the train. Such we deduce from the following authorities to be the rule of decision which obtains in the jurisprudence of this state: Whitehead v. St. L., I. M. & S. R. Co., 99 Mo. 263, 11 S. W. 751; Berry v. Mo. Pac. R. Co., 124 Mo. 223, 25 S. W. 229; O'Donnell v. K. C., etc. R. Co., 197 Mo. 110, 95 S. W. 196.

But it is argued by defendant that though it owed plaintiff the duty to exercise ordinary care for his safety, the court should have· directed a verdict for it, because the evidence conclusively shows that no injury was inflicted upon him until after he had been ejected in safety. In this connection it is urged that the duty which obtains between carrier and passenger and requires the carrier to exercise high care to save the passenger from the insults or assaults of its own servants and others may not be invoked. Of course, this proposition is to be conceded, for, unless the relation of carrier and passenger exists, the obligations incident thereto are wholly beside the case. But though such be true, defendant is liable to respond for the wrongful acts of its servants, committed within the scope of their authority while pursuing the master's business, even though such acts are wanton and willful and in no sense directed by the master as to the particular manner of conduct. [See Bouillon v. Laclede Gas Light Co., 148 Mo. App. 462, 129 S. W. 401; Haehl v. Wabash R. Co., 119 Mo. 325, 24 S.

W. 737.] The record abounds with evidence to the effect that, among other things, it was the duty of Allison, defendant's brakeman, and its conductor, too, for that matter, to eject persons from the train when found riding thereon. Obviously, then, defendant may be required to respond to plaintiff for any injury which he suffered at the hands of the brakeman, Allison, or the conductor, Gibson, or the other brakeman, through the breach of the obligation to exercise ordinary care for his safety or because of their wanton and willful conduct thereabout. But defendant's responsibility touching this matter proceeds in accord with the principle *respondeat superior* and rests upon the law of agency, wholly irrespective of the relation of passenger and carrier. [See Farber v. Mo. Pac. R. Co., 116 Mo. 81, 22 S. W. 631; Whitehead v. St. L., I. M. & S. R. Co., 22 Mo. App. 60, 63.]

It is true that none of the injuries inflicted upon plaintiff was suffered by him while in the car, but it appears from his testimony that the brakeman, Allison, entered the car and sought to eject him therefrom while the train was in motion. Plaintiff says Allison demanded money from him, and, upon his refusal to pay, ordered him to jump from the car, and fired several shots at his feet with a revolver in attempting to enforce the order. During this controversy plaintiff obtained possession of Allison's pistol and ejected him from the car instead. The box car in which plaintiff was riding was next adjacent to the caboose on the train, and it appears that both Allison and the other brakeman assumed positions on the steps annexed to the front platform of the caboose, with guns, as though they intended to inflict injury upon plaintiff. Plaintiff says as he looked out of the car he observed these men so stationed while the train moved along, just prior to reaching Neely's Landing. From this it is obvious that, besides the assault commenced by Allison in the car, defendant's

other brakeman was at least consenting thereto and omitted to exercise any care whatever concerning plaintiff's safety. But be this as it may, plaintiff was in no respect injured while in the car nor in the initial attempt of Allison to eject him therefrom, and it must be conceded that all of the injuries for which compensation is sought were received thereafter. After conceding such to be true, for it is, we are not permitted to accept defendant's argument in its fullest scope, and declare that it conclusively appears plaintiff had been ejected with safety before the assault was made of which he complains. According to plaintiff's evidence, the trainmen on the caboose, that is, the brakeman, Allison, and his companion, were standing ready to participate in his ejection as the train approached Neely's Landing. Immediately upon the stopping of the train, the conductor approached and ordered plaintiff to alight from the car. Plaintiff says the conductor tossed the twenty-five cent piece to him and ordered him to "fall out" of there. In obedience to this command, plaintiff stepped from the car and was assaulted while in the act. Plaintiff says, "I got out and when I first lighted a lick hit me in the back of the head. I was right at the car door in front of the station door but didn't know what brakeman it was. He hit me in the back of the head with the gun he had and gave me a punch and I didn't look around but went straight to that woman's house." From this it appears that the assault which Allison had commenced in the car was followed up by one of defendant's brakemen while plaintiff was in the act of alighting from the car in obedience to the command of the conductor. Obviously, both the conductor, who ordered plaintiff out of the car, and the brakeman, who assaulted him while he was stepping therefrom, were acting in the line of their duty about the master's business, in ejecting plaintiff from the train. It appears, then, the assault which, according to the evidence of plain-

tiff, seems to have continued without perceptible inter-
mission, was first made by defendant's brakeman
while acting within the scope of his authority about
the master's business, pertaining to ejecting plaintiff
from the car.   This being true, defendant is prima.
facie liable for the wrongful and willful acts of its
servants in pursuing and shooting plaintiff thereafter,
for, where an agent begins a quarrel while acting with-
in the scope of his agency, the master may be required
to respond for his subsequent wrongful acts pertain-
ing to the same matter, as the law will not undertake
to say when he ceased to act as agent and commenced
to act upon his own responsibility.   Touching such a
matter, the question is essentially one for the jury
and may not be summarily determined as a matter
of law.   [See New Ellerslie Fishing Club et al. v.
Stewart, — Ky. App. —, 93 S. W. 598, 9 L. R. A. (N.
S.) 475.]   Where the relation of passenger and car-
rier subsists, numerous authorities declare the rule
that the carrier may be required to respond for such
wrongful assaults of its servants commenced upon
the train and pursued for a considerable distance be-
yond the carrier's premises.   Especially is this true
where the subsequent wrongful acts are a continua-
tion of the original assault.   [See Savannah R. Co.
v. Bryan, 86 Ga. 312; Flynn v. St. Louis Transit Co.,
113 Mo. App. 185, 87 S. W. 560; McQuerry v. Metro-
politan St. R. Co., 117 Mo. App. 255, 92 S. W. 912.]
We perceive no valid reason why the identical rule
should not obtain here, for while the carrier owes the
passenger an extraordinary duty pertaining to his
safe carriage and protection, in either case, on the
last analysis, responsibility is entailed under the prin-
ciple *respondeat superior,* which obtains only in the
relation of master and servant.   Because the evidence
tended to prove that the assault was initiated in the
authority of the master, we believe the question of
defendant's liability touching the same and its con-

tinuity was for the jury and that the court did not err in declining to direct a verdict for defendant.

The first instruction given at plaintiff's instance is as follows: "The court instructs the jury that although they find and believe from the evidence that under the rules of the railroad company plaintiff had no right to ride as a passenger on said train from which he was forced to alight (if you find from the evidence that plaintiff was forced to alight therefrom), yet, if you further find and believe from the evidence that plaintiff boarded said train at Cape Girardeau, Missouri, with the consent and permission of the conductor in charge of said train, then in that case plaintiff was not a trespasser on said train, if you believe that he did not know that the conductor had no authority to permit him to ride on the train, and defendant and its employees in charge of said train owed plaintiff the duty of ordinary care. If, therefore, you further find and believe from the evidence that the agents, servants and employees of defendant railroad company on or about the 8th day of March 1910, who were in charge of said train, or any of them, while engaged in the business of the defendant railroad company, and while acting within the scope of their employment, ejected or caused plaintiff to leave said train, and in doing so, willfully and wantonly, or maliciously beat and shot the plaintiff, or that the said servants and employees of defendant assaulted the plaintiff at the time *or immediately after plaintiff left said train,* and followed plaintiff up and shot him, plaintiff, after he left said train, in a willful, wanton or malicious manner, and the plaintiff was injured thereby, then the defendant is liable, and your verdict must be for the plaintiff." This instruction is erroneous in that it submitted to the jury as a predicate of liability the acts of defendant's servants "immediately after plaintiff left said train," without calling for a finding as to whether or not such acts were a

continuation of the assault commenced while plaintiff was being ejected or as he alighted from the car. The words referred to we have italicized in the instruction. For defendant the evidence tends to prove that no assault whatever was made upon plaintiff while he was being ejected from the train. Though the evidence for defendant concedes that Allison, the brakeman, entered the car, as testified by plaintiff, and engaged in a controversy with plaintiff therein, during which plaintiff disarmed him and took possession of his pistol, it tends to prove, too, that Allison did not assault him even at that time. Furthermore, all of the evidence on the part of defendant tends to prove that no assault whatever was made upon plaintiff at the time he alighted from the car at Neely's Landing. On defendant's theory of the case, which the evidence for it tends to support, plaintiff alighted from the car upon the order of the conductor and crossed the road to the residence of Mr. Fulbright, defendant's station agent, about fifty yards away. Upon reaching this residence, plaintiff was observed by Allison and others to be standing in the door engaged in conversation with Mrs. Fulbright, whereupon Allison and another man entered defendant's station and informed Mr. Fulbright that plaintiff, a "bad nigger" with a gun, was at his house. Upon this information being imparted, Fulbright, Allison and others armed themselves and commenced the assault which resulted in the several injuries complained of. Though Fulbright was defendant's station agent, no one suggests it is liable for his acts touching this matter, and it cannot be that either he or Allison was representing defendant at this time, that is, if the evidence for defendant is found to be true. The instruction is erroneous under the facts last stated, for it authorized a recovery if the jury found that plaintiff was assaulted immediately after leaving the train without regard to the fact that it was

essential to affix liabaility that the assault should have been commenced while defendant's servants were engaged in the line of their duty about the master's business in ejecting plaintiff from the car. Touching this matter, the instruction is misleading in that it submits a predicate of liability not sufficiently comphehensive.

Plaintiff's instruction No. 2 is as follows: "The court instructs the jury that although they may find and believe from the evidence that the train upon which plaintiff was riding was not, under the rules of the railroad company, allowed to carry passengers, yet if you further find and believe that plaintiff without any knowledge of said rules got on said train at Cape Girardeau, Missouri, with the consent of the conductor of the defendant who was in charge of said train, then and in that case plaintiff was not a trespasser against said defendant; and if you further find and believe from the evidence that the agents and employees of said railroad company in charge of and controlling said train, or any of them, ejected plaintiff from said train, or caused plaintiff to leave the same, and in doing so, and at the time thereof, *and immediately thereafter* wrongfully, willfully, maliciously and unlawfully assaulted plaintiff by beating him, and by shooting plaintiff with deadly and dangerous weapons, and plaintiff was injured thereby, then the defendant is liable, and your verdict must be for the plaintiff." The words, "and immediately thereafter," which we have italicized in this instruction are unobjectionable, for though they permit a recovery for acts occurring immediately after the ejection they require, through the use of the conjunctive "and," a finding that the assault was commenced while the servants were acting within the scope of their authority in affecting the ejection.

Plaintiff's third instruction is objectionable for

McDonald v. Railroad.

the same reasons above pointed out, touching instruction No. 1.

Plaintiff's sixth instruction is erroneous in that it authorized a recovery for plaintiff if the jury found the *conductor* while acting within the scope of his authority used unnecessary and wrongful means in ejecting plaintiff from the train and continued such wrongful acts without intermission from the time he alighted, etc. There is not a word of evidence in the record tending to prove that the conductor assaulted plaintiff in any manner. It appears from the evidence of plaintiff that the conductor was seen with a gun after the plaintiff had repaired to Fulbright's house, but this is all that is said concerning even threatening conduct on his part. Until then the conductor did no more than order plaintiff from the car. It may be that he was remiss in his duty to exercise ordinary care in preventing the brakeman from assaulting plaintiff in his presence, but the instruction in no sense reckons with a breach of this obligation. This instruction should be redrafted to require a finding according to the evidence.

Plaintiff's instruction No. 4, on the measure of damages, is erroneous in two respects: First, it authorizes the jury to estimate as damages the extent, if any, to which plaintiff has been "prevented by reason of his injuries from working and earning a livelihood for himself and family." This element of damage is the legal equivalent of compensation for loss of time occasioned by the injury and as such is an item of special damages which may not be recovered unless claimed in the petition. [See Slaughter v. Metropolitan St. R. Co., 116 Mo. 269, 23 S. W. 760; Davidson v. St. Louis Transit Co., 211 Mo. 320, 109 S. W. 583.] The petition lays no claim for damages on this score, and it was, therefore, error to submit the matter to the jury. The petition lays a claim of $300, expended for medical and surgical attendance. The instruc-

tion now under consideration authorizes a recovery for the reasonable value of the "necessary medical aid rendered to plaintiff" without limiting such recovery to the amount specified in the petition. In this respect it infringes upon prior decisions of this court and the Supreme Court, touching the same question. [Shinn v. United Rys. Co., 146 Mo. App. 718, 125 S. W. 782; Smoot v. Kansas City, 194 Mo. 513, 92 S. W. 363.]

Plaintiff's instruction No. 5 is as follows: "The court instructs the jury that ordinary care means such care as persons of ordinary prudence, under the same or similar circumstances, would use; therefore the court further instructs you that if defendant's servants in charge of and in control of said train from which plaintiff was ejected (if you find from the evidence that plaintiff was ejected from said train), could by the exercise of ordinary care, as herein defined, have prevented plaintiff's injuries, or if you find that plaintiff was willfully, wantonly or maliciously injured by the servants and employees of defendant while acting within the scope of their employment, as set out in the other instructions herein, and as a result of such injuries so inflicted, the plaintiff was damaged, then the defendant is liable, and your verdict must be for the plaintiff." All of plaintiff's injuries were received by him after he had been ejected from the train, unless it be the blow in the back of the head from the pistol in the hand of the brakeman as he alighted. Without doubt it was the duty of the conductor then present to exercise ordinary care to prevent the brakeman from assaulting plaintiff, and defendant may be required to respond, too, because of the wrongful act of the brakeman in thus assaulting plaintiff at that time, for his ejection from the car was then in progress. But the instruction above copied reckons with and imports the obligation of ordinary care against defendant quite beyond this situa-

tion and beyond subsequent occurrences where the conductor might have prevented the continuing assault of the brakeman. This instruction authorizes the jury to find for plaintiff if it should appear that defendant's servants in charge and control of the train from which plaintiff was ejected could, by the exercise of ordinary care, have prevented plaintiff's injuries and this, too, without regard to the fact that in no sense could defendant be liable therefor unless such injuries were inflicted by its servants during the continuing assault which was initiated while they were acting within the line of duty about the master's business in ejecting plaintiff from the car. The proof is, that a number of citizens at Neely's Landing joined in the chase after plaintiff, and besides these, Mr. Seagraves, a foreman of defendant's bridge carpenters, and Fulbright, the station agent, joined too. While defendant may be liable for all of the injuries which resulted from the acts of these joint tortfeasors, because of the independent liability of one tortfeasor for the joint tort of all, provided its agents were acting within the scope of their authority in committing the tort, it is obvious it did not owe the duty to exercise ordinary care toward preventing others from assaulting plaintiff after he had left the train, if its agents were not representing it in the transaction. As worded, the instruction would seem to impose the obligation on defendant to exercise ordinary care to the end of preventing plaintiff's injuries at all hazards and this cannot be the law of the case.

Plaintiff dismissed the first count of his petition and the recovery was had on the second count only. The petition is inartificially drawn and the second count at least suggests a breach of the obligation on which the carrier owes the passenger. No one can doubt that it defectively states the cause of action revealed in the proof, but it may be amended if plain-

tiff is so advised. For the future guidance of counsel, we may be pardoned in suggesting that it is important to invoke the doctrine with respect to master and servant. It would be well if the amended petition should be drawn so as to more specifically aver the assault made upon plaintiff by defendant's servants was committed by them while in the line of their duty and in pursuit of the master's business in ejecting plaintiff from the train.

Because of the errors above pointed out, the judgment should be reversed and the cause remanded. It is so ordered. *Reynolds, P. J.,* and *Caulfield, J.,* concur.